[Sac. No. 1362.   In Bank.—May 13, 1907.]

## J. R. TELLER, Respondent, v. BAY AND RIVER DREDG- ING COMPANY, Appellant; HENRY BRACK et al., Respondents.

CONTRACT TO CONSTRUCT DITCH—INDEPENDENT CONTRACTOR—LIABILITY FOR NEGLIGENCE.—Under the contract referred to in the opinion, as well as from the evidence of the surrounding circumstances, it is *held* that the defendant dredging company, who had contracted to furnish a ditching dredger and fully equipped crew for the purpose of cutting a ditch through farming lands belonging to the other defendants, was an independent contractor, and solely liable for damages resulting to an adjoining landowner for the negligent operation of the dredger, whereby his lands were inundated and his growing crops destroyed.

GROWING CROP—MEASURE OF DAMAGES—VALUE HOW DETERMINED.—The true measure of damage for the total destruction of a growing or standing crop is the value of the crop in the condition it was at the time and place of destruction. In determining such value, in a suit brought by a lessee of the land on shares, the proper criterion to follow is to determine the probable yield and market value of the crop and deduct therefrom the cost of producing and marketing the same and the value of the share of the landlord.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order refusing a new trial. W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

Jackson Hatch, Walter H. Linforth, and Louttit & Louttit, for Appellant.

Plummer & Dunlap, and Nicol & Orr, for Respondents.

HENSHAW, J.—Plaintiff brought his action to recover damages for the unlawful flooding of his lands and conse- quent injury to his growing crop. The judgment of the trial court held the dredging company alone responsible and awarded damages. That company appeals, advancing two contentions: 1. That Henry Brack and his associates were alone responsible; and 2. That the court (the cause

CLI Cal.—14

was tried without a jury) adopted an incorrect rule for the measure of damages, the application of which rule resulted in an excessive award against appellant.

Appellant entered into a contract with defendant Frankenheimer Brothers as follows: "We, the undersigned, do hereby agree with Frankenheimer Brothers that our 20-foot ditching dredger, shall on or before the 25th day of May, 1903, be at the point in the South Fork of the Mokelumne, to be designated by said Frankenheimer Bros., ready to commence work cutting through the Brack Tract levee at a point above stated, and shall so commence. It is understood that Frankenheimer Bros. are to pay $70 per day of 22 working hours for the sole use and service of above-named ditcher and full crew for the construction of two and one-half miles of ditch; that no other costs shall be assessed to them for any other service whatsoever. We hereby agree that our dredger shall be in first class working order, and that the crew will be efficient and diligent in the prosecution of the work, which we agree will be done in a good and workmanlike manner. The time for which $70 per day of 22 workin ʒ hours is to be paid shall commence when the ditcher starts cutting through the levee, and shall end when the ditcher shall have finished cutting its way out. It being further understood and agreed that if at any time during the progress of the work aforesaid, Frankenheimer Bros. are dissatisfied with the work done by said ditcher, or with the progress of such work, that they may immediately terminate this contract on paying to the undersigned the amount due to us, at the rate above mentioned, for the time during which said ditcher has been actually employed. Any overtime said ditcher may work to be at the above named rate of $70 per day of 22 hours."

The dredger was at the point designated and duly commenced work. To excavate the ditch it was necessary that the dredger should pass from the river through the levee, and so on to the lands of defendants. This was accomplished without injury. Before cutting through the levee the crew of the dredger, under the direction of the captain, constructed a back dam behind the dredger to restrain the water from flowing in through the gap in the levee. The lumber which was used in building this dam was furnished by Frank-

enheimer Bros. The ditch was constructed along a line indi-
cated by the defendant Brack, who, with Frankenheimers,
was a lessee of the land. The ditch work was completed
and the dredger ready to leave on July 14th. Prior to this
date the captain requested Brack to supply him with lumber
with which to build a back dam as the dredger again cut
the levee for its exit to the river. This lumber was fur-
nished, but no dam was constructed, and before the dredger
was taken out through the cut, the inflowing waters inun-
dated a large portion of plaintiff's land, completely destroy-
ing a growing crop of beans and potatoes.

We think, upon the face of this contract as well as from
the evidence of the surrounding circumstances which was
properly received, that the dredging company was an inde-
pendent contractor and solely responsible for the negligent
omission to construct the back dam. It is true that Frank-
enheimer Bros. were to have the "sole use and service of the
ditcher and full crew," but it does not appear that they had
any control over the ditcher, its captain, and its crew, other
than the general right which would belong to any owner to
designate the place of performance and the general character
of the work. The provision to the effect that if Frankenheimer
Bros. became dissatisfied with the work or its progress they
might terminate the contract, is at variance with the theory
that they exercised any right of active control, since, if so,
there would have been the power to employ and discharge men,
and there would have been no occasion for dissatisfaction in
this regard. The corporation contracted that the dredger
would be manned by an efficient and diligent crew, and that
the work should be done in a good and workmanlike manner.
When attention is paid to the evidence of the attendant and
surrounding circumstances, the conclusion that the dredging
company was an independent contractor becomes the more
irresistible. Before going to the work, the captain of the
dredger received his instructions from an officer of the de-
fendant company, by whom all of the crew were employed
and paid. The dredger was entirely under the supervision
and control of its captain, and he in turn received his instruc-
tions from the officers of the company, saving alone the gen-
eral instruction as to the location and character of the work
to be performed. The Frankenheimer Bros. neither had, nor

attempted to exercise, any power of hiring or discharging the members of the crew, and the court finds upon sufficient evidence that neither Brack nor the Frankenheimers had, or attempted to exercise, any control over the captain or crew of the dredger in the performance of the work, and that the appellant and its employees had full control of the work and were in no way subject to the direction of the other defendants save as to the place where the canal was to be excavated. Moreover, upon the face of these facts it would be a conclusion amounting almost to absurdity to say that the Frankenheimers, who were shown to be no more than farmers and unskilled in dredging work and in the use of dredgers, should be held accountable for the necessary details in the proper performance of an undertaking such as this, and that it was, or ever could have been, contemplated that they, and not the dredging company, knew how the work should have been performed, and that a back dam was necessary for its proper performance, and that they had undertaken the legal responsibility of such construction. It is concluded upon this point, therefore, that the trial court was correct in attaching the responsibility to the appellant corporation. (*Callan* v. *Bull*, 113 Cal. 595, [45 Pac. 1017]; *Hedge* v. *Williams*, 131 Cal. 459, [82 Am. St. Rep. 366, 63 Pac. 721, 64 Pac. 106]; *Frassi* v. *McDonald*, 122 Cal. 401, [55 Pac. 139]; *Louthan* v. *Hewes*, 138 Cal. 119, [70 Pac. 1065]; *Green* v. *Soule*, 145 Cal. 97, [78 Pac. 337].)

It is contended that the court erred in arriving at the amount of damage sustained by plaintiff. In strictness the contention is not that the court erred in declaring the measure of damage, but that it erred in arriving at the damage under a statement of the true measure. The true measure of damage for the total destruction of a growing or standing crop is the value of the crop in the condition it was at the time and place of destruction. Such is the unquestioned rule, and such was the rule of the court declared in the following language, which language, as the cause was tried without a jury, is copied from the opinion of the trial court: "In arriving at the value of the crops as they then stood (at the time of their destruction) and in the condition in which they were, the court has adopted, as the best means available, the probable yield of each tract multiplied by the market

value of the crop, deducting therefrom the cost of producing and marketing said crops, and deducting therefrom the one fourth of such value as and for the landlord's share, and has awarded the remaining three fourths to the plaintiff, as the assignee of the tenants so sustaining such loss.''

The question thus turns upon the mode of ascertaining the value of a growing crop at the time of its destruction. The appellant contends that the rental value of the land, with the cost of labor and materials up to the time of destruction expended in producing the crop, with legal interest at legal rate thereon, furnishes the correct method of arriving at this value. Such a method finds support from and has been adopted by the supreme court of South Carolina in the case of *Horres* v. *Berkeley Chemical Co.*, 57 S. C. 189, [35 S. E. 500]. The objection to this method is that it is not a determination of *value* at all. It is but a determination of *cost*, which, while always an element of value, never furnishes its exact measure. By such a method of computation nothing is allowed for the fact that the crops, simply as growing crops, and before maturity, are necessarily an expense and not a profit to the owner. They are of value to him, not as growing vegetation upon his land, but because in the course of nature they will come to fruition, and so have a market value, and thus will bring to him profit for his disbursement and expenses in their care and maintenance. Moreover, in taking cost as the measure of value, there is lost sight of the fact that by the destruction of the crop it cannot for that year at least be replaced, and that the very possibility, aside from the reasonable expectation, of future profit is forbidden to the agriculturist. And, finally, that cost cannot be the measure of the detriment under such circumstances ought to become patent from consideration of the fact that if you should upon successive years, destroy the farmers' crops, and in full compensation therefor pay him only the money which he had expended in their growth up to the time of destruction, you could in a very short time starve to death every agricultural community in the United States. The true rule in arriving at the value at the time of destruction is that laid down by the trial court and abundantly supported by authority. The supreme court of Utah well states the proposition (*Lester* v. *Highland Boy Gold Min. Co.*, 27 Utah, 470, [101 Am. St. Rep.

988, 76 Pac. 341]) : ''In cases of destruction of growing crops it is proper and important to introduce and admit evidence showing the kind of crops the land is capable of producing, the kind of crops destroyed, the average yield per acre of each kind on the land not destroyed and on other similar lands in the immediate neighborhood, cultivated in like manner, the stage of growth of the crops, at the time of injury or destruction, the expense of cultivating, harvesting and marketing the crops, and the market value at the time of maturity, or within a reasonable time after the injury or destruction of the crops. And,'' proceeds that court, ''while all such evidence may be considered by the jury in determining the amount of damages, if any, still the true measure of compensation is the value of the crops in the condition they were in at the time of their injury or destruction.'' In *Shoemaker* v. *Acker,* 116 Cal. 239, [48 Pac. 62], the introduction of such evidence as the means of arriving at value is distinctly approved, and the same proposition is recognized as containing the true element for determining damage in *Ellis* v. *Tone,* 58 Cal. 289. And that such is the generally accepted rule is abundantly established. (8 Am. & Eng. Ency. of Law, p. 330; Jones on Evidence, sec. 384; Sutherland on Damages, secs. 120, 1023; Sedgwick on Damages, sec. 191.)

For these reasons the judgment and order appealed from are affirmed.

Sloss, J., Angellotti, J., McFarland, J., Lorigan, J., and Shaw, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing, and filed the following opinion on the fifteenth day of June, 1907 :—

BEATTY, C. J.—I dissent from the order denying a rehearing and from the judgment of the court.

This case grows out of a contract exactly parallel to a hiring by the hour of a carriage, horses, and driver from a liveryman. In such a case the carriage, team, and driver are put at the sole use and service of the hirer, but he does

not assume to direct the driver how to guide his horses, or what precaution he must observe in order to avoid collision with other vehicles. As to such matters the driver takes his orders from his employer, the liveryman, and for any injury caused by his dereliction in those particulars, the liveryman is responsible. But as to the direction in which he is to drive and the places to which he is to go, he takes his orders from the hirer, and if he should be directed by him to drive into an inclosed field on the hirer's ranch and on returning to leave the gate open behind him, allowing cattle to enter and destroy the tenant's crops, I should think the hirer, and not the liveryman, would be responsible for that damage. As I construe this contract, the Frankenheimers hired the dredger and crew, just as one would hire a carriage and driver. They had nothing to do with the operation of the dredger. As to that the crew took orders from the defendant, who by its officers did nothing more than to send the dredger and crew to a point outside the levee selected by the Frankenheimers (just as a liveryman sends his carriage to your door). At that point they took charge to the extent of directing it to cut its way in through the levee, and thereafter to excavate a certain canal. From the time it commenced cutting its way in until it should cut its way out, it was subject, as to its movements, to their exclusive control, and their control was to last just as long as they were willing to pay seventy dollars per diem. When it came to cutting out it was for them to decide whether they would pay at the rate of seventy dollars a day for the time required to construct a back dam, or whether they would take the risk of cutting out without a back dam. Undoubtedly they had the power (and as between them and the defendant were bound to exercise it) to forbid the cutting of the levee before a back dam was constructed, and they should be held responsible for the consequences of their choice. The loss of plaintiff's crops was caused by them—not by the appellant.

As to the rule of damages, the decision seems to be in conflict with the decision in *Crow* v. *San Joaquin etc.,* 130 Cal. 314, [62 Pac. 562, 1058].

I think the judgment should have been reversed.