[Civ. No. 654.    Third Appellate District.—March 21, 1910.]

## CHARLES E. SACCHI, Respondent, v. BAYSIDE LUMBER COMPANY, Appellant.

NEGLIGENCE—MOVING OF TIMBER JAM—INJURY TO PLAINTIFF'S LEASE-HOLD—SUPPORT OF VERDICT.—In an action for damages to plaintiff's leasehold alleged to have resulted from defendant's negligence in moving an immense timber jam existing in a stream above plaintiff's property, so as to cause it to break a dike on plaintiff's land, and causing a flooding thereof with debris from the stream, to the destruction of a great part of plaintiff's grazing land, and to the serious injury of his dairy business, it is held that a verdict for damages to plaintiff's leasehold from defendant's negligence in the sum of $3,500 was fully warranted by the evidence.

ID.—QUESTIONS FOR JURY—DISPUTE AS TO CAUSE OF DAMAGE—EFFECT OF VERDICT.—The questions whether the damage was caused by the logging operations of the defendant, negligently conducted, as claimed by plaintiff, or was caused by the operations of a rock quarry, as claimed by defendant, were for the jury to determine. The verdict for the plaintiff is indubitable evidence that the damage was the direct result of defendant's negligence.

ID.—DISPUTE AS TO OPERATIONS BY INDEPENDENT CONTRACTORS OR BY DEFENDANT'S AGENTS—SUBMISSION TO JURY.—The court properly submitted to the jury the question whether persons receiving a fixed compensation for their services were independent contractors or were agents acting under the supervision of the defendant, where there is a dispute and conflicting evidence on that subject; and the verdict of the jury for the plaintiff is conclusive that they were agents and not independent contractors.

ID.—NATURAL RESULT OF OPERATIONS—KNOWLEDGE AND ANTICIPATION BY DEFENDANT.—The natural result of the operations of the defendant in removing the original jam from its position above plaintiff's land must necessarily have been known to, and anticipated by, defendant and its officers.

ID.—VERDICT CONCLUSIVE ON QUESTIONS OF FACT.—The verdict of the jury is conclusive on all questions of fact submitted thereto by the court or involved in the case.

ID.—EVIDENCE BEARING ON DAMAGES—PRODUCTION OF LAND DURING PREVIOUS YEAR.—Evidence as to what the land leased by plaintiff produced in the year previous to that in which the damage was sustained was admissible as tending to show the adaptability of the land damaged to the cultivation of crops growing thereon,

and its capacity for producing crops in such quantity as was essential to the dairy business.

Id.—Diminished Value of Leasehold—Rental Value of Damaged Land—Cost of Restoration.—Evidence was admissible to show the diminished value of the leasehold during the remainder of the term by reason of the damage caused to the land from defendant's negligence, and, to that end, to prove the rental value of the damaged land per acre, and the cost of restoring the land to the condition in which it was when submerged.

Id.—Other Elements of Damage—Dairy Cows—Butter Fat—Cost of Keeping on Other Land.—Evidence of the number of dairy cows kept by plaintiff, of the quantity of butter fat produced from them in the previous year, and of the cost of maintaining them on other land which he was compelled to rent for that purpose, was admissible on the question of damages.

Id.—All Proofs of Damage to be Considered Together.—All of the proofs relating to the questions of damages are to be considered together, as furnishing as fair a foundation as can be shown or approximately laid to arrive at a just and reasonable assessment of damages.

Id.—Damages Proved not Remote or Speculative—Injury to Particular Crop and Business—Loss of Prospective Profits.—The damages proved are not remote or speculative. It is always admissible to prove that land damaged is peculiarly adapted to a particular kind of crop, and what it is capable, under ordinary circumstances, of growing as to kind and quality, and to prove and recover the loss of prospective profits which would naturally flow from a business damaged, had such business not been destroyed or impaired, so as to obstruct its prosecution in the ordinary way in which it has always been conducted.

Id.—Measure of Damages—Damage Likely to Result from Tort.— The damages which, in the ordinary course of things, would be likely to result from a wrongful or tortious injury to property are the basis or measure of compensation to which the plaintiff is entitled for the injury so inflicted.

Id.—Instructions—Action upon Requests.—*Held,* that, considering the entire charge of the court, every principle of law applicable to the issues and evidence was correctly declared and explained to the jury with clearness; that correct instructions requested and disallowed were otherwise given in the charges, and that, where requests were modified, it was either because the part modified was either inapplicable or incorrectly stated, or announced elsewhere.

Id.—Inapplicable Request—Injuries Caused by "Act of God."— Where there was no evidence to justify a requested instruction that if the jury found that the injuries to plaintiff's property

were caused by the "act of God," defendant would not be liable, it was properly disallowed.

ID.— IMPROPER REQUEST — BRIDGES FOR PASSAGE OF COWS — LOSS — LEASEHOLD PROPERTY—DUTY OF REPAIR.—The court properly disallowed a requested instruction that if the bridges spanning small sloughs on plaintiff's land, for the passage of his cows, were part of the realty, plaintiff could not recover for their destruction, where it appears that such bridges were a part of plaintiff's leasehold, and that it was plaintiff's duty to keep the bridges and other fixtures on the land leased in repair.

ID.—MISLEADING REQUESTS—GENERAL RIGHT TO PROTECT PROPERTY.— Where the court had given a proper instruction as to the right of defendant to protect its railroad trestle from injury or destruction by removing the jam therefrom with ordinary care, and with a view to the rights of others below, the court properly refused general and indefinite instructions as to the right of any person to protect his property with the use of ordinary care, which were calculated to mislead the jury that the big jam was wholly disturbed to protect property, when in truth the sole purpose thereof was to utilize part of the timber composing it, and it appears probable that 'if the body of the jam had been undisturbed, the winter rains would have carried the whole through the stream into Humboldt bay without injury to plaintiff's leasehold.

ID.—VERDICT NOT EXCESSIVE—REVIEW UPON APPEAL.—*Held,* that the face of the record does not show that the verdict was excessive, but shows that the evidence amply justified the amount of damages awarded. The appellate court is not warranted in substituting its judgment for that of the jury and of the trial judge.

APPEAL from a judgment of the Superior Court of Humboldt County, and from an order denying a new trial. G. W. Hunter, Judge.

The facts are stated in the opinion of the court.

Denver Sevier, for Appellant.

Otto C. Gregor, for Respondent.

HART, J.—This is an action for damages for injuries alleged to have been inflicted upon the leasehold of plaintiff through the negligence of the defendant.

The complaint asked for damages in the sum of $5,200, but the jury by whom the cause was tried assessed the damages

at the sum of $3,500, for which amount the court subsequently caused judgment to be entered in favor of plaintiff.

This appeal is from the judgment so entered and the order denying defendant's motion for a new trial.

The injuries alleged to have been sustained to plaintiff's property were the result of the overflow upon his land of the water from Jacoby creek, in Humboldt county, and it is charged that said overflow and the consequent submerging and damaging of plaintiff's land was caused by the negligent acts of the defendant.

The defendant is a corporation, and the purpose for which it was organized as such was to carry on and conduct the logging and lumbering business, in which, for many years prior to the institution of this action, it and its predecessor, the Bayside Mill and Lumber Company, were engaged on Jacoby creek, in Humboldt county.

The plaintiff, at the time the injuries complained of were sustained, and for some years prior thereto, was the lessee and in the possession of something over three hundred acres of land bordering on said Jacoby creek, and through and over the southwesterly portion of which the channel of said creek passed. Said creek is described in the complaint as "a natural watercourse in said Humboldt county, about twelve miles in length, and flowing in a northwesterly direction and emptying into the northern portion of Humboldt bay . . .; that said Jacoby creek is a stream amply sufficient in width, size and flow of water to carry and bear along and float in its waters to said Humboldt bay, while flowing along from its source to said Humboldt bay, all natural debris, refuse and drift, if unrestrained, which would naturally float or fall into and be carried along by the waters thereof and the natural current of said Jacoby creek."

The complaint further states that, for more than a year prior to the time at which the alleged injuries were inflicted upon plaintiff's leasehold, the said land of plaintiff was "protected by a good and substantial dike and embankment theretofore constructed and built on and along said bank by said plaintiff and his said lessors, and that at the said time of said hereinafter-mentioned overflow of said Jacoby creek, and for a year or more prior thereto, said dike and embankment was of sufficient width, height and strength to fully

protect, and the same would have fully protected, and did fully protect, said land leased to said plaintiff as aforesaid from and against any encroachment of or overflow by the salt tide waters of said Humboldt bay and the waters of said Jacoby creek in the natural rise and fall and flow of said waters of said Humboldt bay and of said Jacoby creek.''

Said land so under lease to plaintiff, it is alleged, was, prior to and at the time of the infliction of the damage complained of, improved and valuable farming and dairy land, ''and prior thereto had been properly seeded to tame grasses by said plaintiff and was then valuable grazing land and producing an abundant stand of tame grasses for pasturing purposes, and was then used by said plaintiff as dairy and grazing land.''

It is averred that, for more than six years prior to the twenty-seventh day of January, 1905, the predecessor of defendant, Bayside Mill and Lumber Company, a corporation, was the owner and in the possession of a large tract of land situated on both sides of Jacoby creek ''and lying along said creek, up said creek, from and above'' the land leased to plaintiff; that said corporation was for many years engaged in cutting and logging the timber standing on its said tract of land and removing the same therefrom; that, ''while said timber was being so cut and removed from said tract of land, and by reason thereof, great quantities of debris and refuse logs, timber and material were worked up from said timber so cut, logged and removed as aforesaid, and remained and were left upon said tract of land, and thereby accumulated thereon and were placed in and left upon, along and adjacent to the banks of said Jacoby creek and in such manner that said debris and refuse logs, timber and material, placed in and left upon, along and adjacent to said banks of Jacoby creek, as aforesaid, would be and were, prior to the second day of January, 1905, in large and excessive quantities carried and floated by the elements and the natural flow and current of said Jacoby creek into the waters of said Jacoby creek.''

It is further shown by the complaint that said corporation, in order to restrain and keep said debris, drift, refuse logs and timber, etc., from being carried farther down said creek, and to thereby prevent the bed of said creek from being

filled therewith and the water therein from running over and inundating the lands of lower riparian owners, caused to be formed out of said natural debris, drift, logs, etc., "an immense and compact jam and obstruction in and across said Jacoby creek and which extended up, in and along said Jacoby creek for a distance of four hundred yards or thereabouts, and completely filled and obstructed said Jacoby creek for said distance from bank to bank, and, as so detained and restrained by said Bayside Mill and Lumber Company, . . . said jam and obstruction was then and there so compact in character and so fastened and secured by said Bayside Mill and Lumber Company, . . . that said debris and refuse logs, timber and material and natural debris contributing and forming the same would not be, and no part thereof would be, thereafter carried down stream by the current and waters of said Jacoby creek, and that said jam and obstruction, if not disturbed or interfered with or loosened or opened up by any person, would thereafter permanently remain intact and in the same place and condition as the same was then in."

The complaint discloses that, on the twenty-seventh day of January, 1905, the defendant became the owner of all the property and rights of the Bayside Mill and Lumber Company heretofore mentioned, and thereafter, as stated, continued to carry on and conduct the logging and lumbering business on said Jacoby creek.

It is charged that the defendant, after succeeding to the business of said Bayside Mill and Lumber Company, negligently caused the "big jam" to be so disturbed and loosened as that the drift, debris, refuse logs and other materials of which it was composed floated lower down the creek and formed other jams at different points, one of which being opposite the dike erected on plaintiff's land for its protection against overflow from said creek. It is declared that these latter jams became compact in form, and in that condition would not have interfered with the natural capacity of the creek to carry to the Humboldt bay all the waters, debris, etc., naturally flowing therein, but that defendant carelessly and negligently caused said jams to be loosened, with the result that said debris and refuse logs, timber and material and drift were forced farther down the stream, form-

ing, at a point where said creek passes through the south-westerly portion of plaintiff's land, an immense jam and an obstruction to the free and natural passage of the waters of said creek. This last-mentioned jam, it is averred, caused the waters of said creek to be restrained from their natural flow and impounded, so that when the winter rains of 1906-7 came, said obstruction or jam caused the waters of said creek to "back up in great and unnatural volume, and rise to a great and unnatural height and break through and destroy said dike and embankment and overflow the banks of said Jacoby creek," and overflow and submerge a large portion of plaintiff's land, thereby destroying said land for pasturage and dairy business purposes, for which plaintiff had leased and to which he had put the use of said land.

The complaint further charges that the defendant had maintained railroad trestles at several different points across Jacoby creek, and that "said trestles obstructed the otherwise free passage of all kinds of drift while being carried down stream in said Jacoby creek by the current thereof."

The answer specifically denies all the important and essential averments of the complaint.

The appellant contends that the evidence is insufficient to justify the verdict, and that the court erred in its rulings receiving and excluding certain evidence and in giving, refusing and modifying certain instructions.

1. That the evidence conclusively shows that in the month of January, 1907, the high waters of Jacoby creek "backed up" and broke through the embankment or dike which had been constructed and maintained on plaintiff's leasehold, and that by reason thereof a large portion of plaintiff's land was inundated and seriously damaged, is not, and, manifestly, could not, be confuted by the defendant.

It is the contention of the appellant, however, that the defendant was in no manner or degree responsible for the breaking of the plaintiff's dike by the high waters of Jacoby creek and the consequent submerging and damaging of plaintiff's land.

The facts developed by the evidence may be epitomized as follows:

The plaintiff, by an instrument in writing, leased the land involved here for the term of six years, beginning with the

first day of November, 1904. By the terms of said lease, he agreed to pay for the use of said land the sum of $1,800 per year for the first two years of said term and $2,000 per year for the remaining four years. It was stipulated that said rent should be paid to the lessors in monthly installments equal to one-twelfth of the annual rent on the first of each and every month during the term. It was further covenanted on the part of the plaintiff that he would "keep all buildings, fences, dikes, flood-gates, etc., in good repair during the continuance of said lease."

The land leased by plaintiff was reclaimed tide and marsh lands, and on it were a number of sloughs across which small bridges had been erected and maintained by plaintiff to enable the dairy stock to pass from one part of the land to another.

The plaintiff conducted a dairy business on said land, having leased it expressly for that purpose. The evidence shows that the land damaged was capable of feeding and accommodating about thirty head of cows. This number of cows, it was shown, was in fact kept on the land up to the time that it was overflowed by the waters from the creek.

The "big jam," to which reference has been made, was the result of the gradual accumulation for many years of logs, timber, debris, drift, etc., and was in existence before and at the time the defendant acquired the property and rights of the Bayside Mill and Lumber Company.

In the years 1895 and 1896, one Monahan caused a boom to be placed across the creek at the point where said "big jam" was located, for the purpose of restraining said jam, or preventing it from becoming loosened and floating down the stream. The boom was fastened by a wire rope. The jam remained in this condition for many years and until after the defendant became the owner of the logging and lumbering business of its predecessor. According to the testimony, had said jam remained in this condition—that is, in compact form and so restrained as to have prevented it from floating down with the current during the high waters of the winter—it could have produced no harm.

In the year 1905 the defendant entered into a contract with one De Lucca, by the terms of which the latter agreed to, and in pursuance of said contract did, cut up and convert into

shingle bolts the timber suitable for that purpose of which said "big jam" was largely constituted. The result of thus handling said timber was to so loosen the jam as to cause the remaining materials of which it was partly formed to float down the stream. The complaint charges and the proof shows that other jams were formed in the creek from the materials which came from the "big jam" and floated down the creek.

In January, 1906, the plaintiff served upon the superintendent of defendant a written notice, calling his attention to the probable damage which would result to plaintiff's land if the defendant did not take proper care of the tree tops and timber refuse from its logging operations and prevent the same from being carried into Jacoby creek.

As alleged in the complaint, the evidence discloses that an immense jam was formed near plaintiff's land from the refuse and other materials of which the "big jam" was originally in part formed, and, additionally, as the result generally of the logging operations of defendant. There was also formed a jam around one of the railroad trestles of defendant. It was these last-mentioned jams which finally, through the rise of the waters of Jacoby creek from the rains of the winter of 1906-7, which were directly responsible for the gathering of the water in said creek opposite plaintiff's dike in such a large and unusual volume as that said creek was incapable of accommodating and carrying off the same in and through its natural channel. The result was, as the complaint alleges, that said water "backed up" and broke through plaintiff's dike, flooding approximately eighty acres of his land, forming a new channel of said creek through a portion of said land, and practically destroying for the purposes for which plaintiff had leased it that portion so flooded and inundated.

The immediate effect of the submergence of plaintiff's land in the manner described was, according to the testimony, to leave a large portion thereof covered with refuse, debris, drift, gravel, sediment and salt tide water. Some of the witnesses testified that about seven acres were covered with gravel, from three inches, in some places, to over two feet deep, in other places; that about sixteen acres were covered with sediment of sufficient depth to kill the vegetation growing

thereon at the time, and that approximately sixty acres were covered with salt tide water, the effect of which was to destroy the grass then growing thereon. It was shown that the land inundated could not be restored to its original condition, or to a condition in which it could be utilized for dairying purposes under two years. There were remaining, at the time of the flood, two years of the term stipulated for in the lease, so that that portion of the leasehold affected by the overflow was completely destroyed, so far as plaintiff's rights under the lease were concerned.

The evidence shows that De Lucca cut the timber of which the "big jam" was largely formed and transformed the same into shingle bolts under a contract with defendant.

On behalf of the defense, one Newell testified that for many years prior to the flooding of plaintiff's land, he was engaged in the logging business on Jacoby creek. It appears that he had a contract with the defendant by which he did all the logging for that corporation. He testified that the bank of said creek was very steep at the points where he carried on the logging, and that refuse from the logging operations was naturally carried and precipitated into the bed of the creek by the winter rains and high water. The object of this testimony was, undoubtedly, to show that the overflow of plaintiff's land was caused primarily by the refuse from the logging operations prosecuted by Newell under his contract with defendant as an independent contractor, and not, as alleged and contended by plaintiff, by the formation and disturbance of the jams in the manner described in the complaint.

It further appears, from evidence produced by the defendant, that, for many years, a large rock quarry was operated by certain parties on land bordering upon Jacoby creek. The obvious purpose of this testimony was to show, if it could be done to the satisfaction of the jury, that the bed of the creek was filled with debris or rocks and other refuse as the result of the operation of said quarry, and that thus the channel of the creek was so filled up as to interrupt and greatly interfere with the natural flow or passage of the waters of said creek; that the "backing up" of the water and the consequent flooding of plaintiff's land was primarily and proxi-

13 Cal. App.—6

mately occasioned by the operations of said rock quarry, and not due to any act or acts of the defendant.

We have thus briefly stated the facts brought out by the evidence introduced by the plaintiff, and have referred to some of the evidence presented by the defendant involving the defenses upon which it appeared to have relied against the claims of the complaint.

Appellant points out a large number of particulars in which it insists that the verdict is not justified by the evidence. These we shall not give specific examination. We have satisfied ourselves, from a painstaking examination of the whole record, that the jury were fully warranted in returning the verdict upon which the judgment is founded.

The questions whether the damage was caused by the operations of the rock quarry or by the logging operations conducted by Newell were for the jury to determine. The verdict is, of course, indubitable evidence that the jury were satisfied from the proofs that the damage was the direct result of the negligence of the defendant.

So it is true as to the question whether De Lucca and Newell were independent contractors. While it is true that both De Lucca and Newell performed the work assigned to them under contracts by which they were to receive a certain specific compensation for such services, not in the nature of wages, each, nevertheless, prosecuted his work in conformity with the general directions of the defendant. The work in which De Lucca engaged was, in fact, done under the direct superintendence of one Monahan, an employee of defendant. Moreover, the court submitted for the jury's decision the questions whether Newell and De Lucca were independent contractors and, if so, whether the performance of the work done by them for defendant in the ordinary mode of doing such work would and did necessarily and naturally result in producing the defect or condition which caused the injury. The jury, therefore, passed upon these questions, and, as the verdict shows, against the theory advanced and contended for by the defendant.

It is scarcely necessary to remark that it is plainly manifest that the necessary and natural result of the removal from the "big jam" of the large quantity of timber out of which from one hundred and forty to one hundred and fifty cords

of shingle bolts were manufactured by De Lucca would be the disturbance of said jam, so that the remainder of the materials of which it consisted would not remain in their original position, but would, upon the first heavy rains and consequent rising of the waters of the creek, naturally flow down the stream with the current. And, in this connection, it may well be observed that such result must necessarily have been known to and anticipated by defendant or its officers.

Appellant advances the further proposition that, in removing the jam which had formed about one of its railroad trestles, it only did what was absolutely necessary to be done in order to protect its property from destruction. This question, too, was submitted to the jury by the court, and upon that as well as upon all the questions of fact submitted for determination the jury's verdict is conclusive.

2. Many errors are imputed to the rulings of the court in admitting and rejecting certain evidence. Most of these involve questions bearing upon the elements which the court permitted to be shown as forming the basis upon which the amount of damages should be determined. The following may be given as examples of the rulings to which we refer: Permitting proof of the kind and character of the crop grown on the damaged land in the year immediately preceding that in which the damage was sustained; proof of the number of cows plaintiff had and which grazed on said land the previous year; proof of what plaintiff did with his cows after the flood —that is, that he was compelled by reason of the flood to rent other land on which to keep and feed said cows; proof of the cost of floodgates destroyed; proof of steps taken and work necessary to divert the waters of the creek to its old or original channel; that plaintiff had to buy feed for his cows subsequently to the flood; the number of pounds of butter fat obtained from said cows in the years 1906 and 1907; the number of cows he had on the land in 1907; the amount of rent he was required to pay for the use of other lands after the flood; the effect of the gravel left on the ground by the flood; the rental value of the flooded land; the cost per acre "to place the land back into the same condition it was before the sediment was on, and to seed it to clover or rye grass"; the value of the crop raised on the land in 1906, the year immediately preceding that of the flood, etc.

The testimony shows, as the complaint alleges, that the flooded and damaged land was under a state of cultivation at the time of the overflow, and that it had formerly produced a sufficient quantity of grasses for the proper sustenance of the dairy cattle kept by plaintiff on said land.

We perceive nothing in the testimony upon the question of damages allowed by the court over the objections of the defendant which was not competent and relevant.

Evidence of what the land produced the year previous to the year in which the damage was sustained was proper as tending to show the adaptability of the land to the cultivation of the crops customarily grown thereon, and its capacity for producing such crops in such quantity as was essential to the dairy business. It will not be denied, we suppose, that it was proper to show the diminished value of the leasehold during the remainder of the term by reason of the damage to the land, and to that end prove the rental value of the damaged land per acre and likewise the cost of restoring the land to the condition in which it was at the time it was submerged. In short, all this testimony, as well as that relating to the number of dairy cows kept by plaintiff and the quantity of butter fat produced the previous year and the cost of maintaining his cows on other land which he was compelled to rent for that purpose after the flood, competently furnished as fair a foundation as can be shown or approximately laid in such cases upon which the jury might be enabled to reach an intelligent, just and satisfactory conclusion as to the probable extent of the actual damage suffered by the plaintiff and thus to arrive at a just and reasonable assessment of damages.

Appellant declares that much of this testimony is too remote and speculative; but it is always permissible, in cases of alleged tortious injury to land, in order to reach a reasonably fair and equitable estimation of damages, to prove that it is peculiarly adapted to the production of a particular kind of crop and what it is capable, under ordinary circumstances, of growing, both as to quality and quantity. Therefore, it is proper to show what the land has ordinarily produced within a reasonable time in the past as bearing upon what it might reasonably be expected to have produced when destroyed, when, as here, such destruction has taken place before the

maturity of the crop and what it is probable that it might yield (in this case) during the remainder of the unexpired term of the lease. This, too, together with evidence of what has been the ordinary yield of butter and other products from the dairy, would serve as a reasonable criterion by which the future profits might reasonably be expected to be. And it is always permissible to prove and recover "prospective profits," where it is shown that such profits would naturally and directly flow from a business which had been damaged had such business not been destroyed or impaired by the damage so as to obstruct its prosecution in the usual and ordinary way in which it had always been conducted. (*Hawthorne* v. *Siegel,* 88 Cal. 159, [22 Am. St. Rep. 291, 25 Pac. 1114]; *Giaccomini* v. *Bulkeley,* 51 Cal. 260; *Shoemaker* v. *Aker,* 116 Cal. 240, [48 Pac. 62]; *Barnes* v. *Berendes,* 139 Cal. 32, [69 Pac. 491, 72 Pac. 406].)

In other words, the damages which, in the ordinary course of things, would be likely to result from a wrongful or tortious injury to property, must be taken as the basis or measure of the compensation to which the complaining party would be entitled for the injury so inflicted. (Civ. Code, sec. 3300.)

That evidence of the diminished value of the leasehold by reason of the injury thereto was competent, is a proposition so obvious that authorities need not be cited in its support, although many may be found in which the doctrine is asserted and applied. (*Ellis* v. *Tone,* 58 Cal. 289; *Ft. Worth & N. O. R. Co.* v. *Wallace,* 74 Tex. 581, [12 S. W. 227]; *Ridley* v. *Seaboard & R. R. Co.,* 118 N. C. 996, [24 S. E. 730]; *Ft. Worth & D. C. Ry. Co.* v. *Hogsett,* 67 Tex. 685, [4 S. W. 365]; *Pennsylvania Co.* v. *Hunsley,* 23 Ind. App. 37, [54 N. E. 1071]; *Fremont Ry. Co.* v. *Harlin,* 50 Neb. 698, [61 Am. St. Rep. 598, 70 N. W. 263]; *Baltimore & O. S. W. R. Co. et al.* v. *Quillen,* 34 Ind. App. 330, [107 Am. St. Rep. 183, 72 N. E. 661]; *Wichita Gas & Elec. Light & Power Co.* v. *Wright,* 9 Kan. App. 730, [59 Pac. 1085].)

Some other rulings than those to which we have devoted some special attention are complained of, but they were, in our opinion, without prejudice, assuming that they were erroneous.

3. Appellant challenges the correctness of the action of the court in refusing to give certain instructions requested by it and in modifying certain other instructions proposed by it,

and as so modified submitting the same to the jury. We shall notice only a few of these assignments in detail. But we may here say that we have given the entire charge of the court careful consideration, and that therein, in our judgment, every principle applicable to the issues raised by the pleadings and developed by the proofs was correctly declared and explained to the jury by the court in singularly clear language. It may be added that in all instances where instructions, containing correct and pertinent declarations of principles of law, were proposed by defendant and disallowed, the court in other instructions submitted to the jury such principles; and where instructions proposed by defendant were modified, it was either because the principle involved in the part modified was not applicable or not correctly stated or was announced in some other of the given instructions.

There was no evidence justifying the giving of instruction No. 6, requested by defendant, wherein it was proposed to tell the jury that if they found that the injuries to plaintiff's property were caused by the "act of God" the defendant would not be liable.

Instruction 15, requested by defendant and disallowed by the court, was properly refused. It would have declared to the jury that, if the bridges referred to in the complaint as spanning some small sloughs on plaintiff's leasehold were "embedded in the real estate and was considered by plaintiff as a part thereof not to be removed," then such bridges must be considered by them as part of the realty, and that plaintiff could not recover for their destruction. As we have seen, the plaintiff built these bridges for the purpose of permitting his cattle to pass from one field to another, and, while he testified that they were built with the intention that they should remain permanently on the land, it is no defense to a recovery for their loss or destruction to say that they became and were a permanent part of the realty. By the terms of his lease it was his duty to keep the bridges and other fixtures on the premises in repair. But the bridges were an essential and necessary part of plaintiff's leasehold, and as well could it be maintained that he could not recover for the crops growing on the land and destroyed by the water.

The several instructions expounding the principle that a person may take such steps as may be reasonably necessary to protect his own property from injury or destruction, where

he exercised ordinary care in so doing, were properly refused. There was, as seen, some evidence that the defendant had removed a jam which had formed around one of its railroad trestles, and as to this jam and the act of the defendant in removing it, the court instructed the jury that, in order to protect said trestle or any other of its property from destruction or injury, the defendant had the right to remove said jam, if it did so in view of "the rights of others below" and by the exercise of ordinary care. The rejected instructions were entirely too general and indefinite, and would perhaps have tended to mislead the jury into the belief that the defendant caused the "big jam" to be disturbed in order to protect its property, when the truth is, the disturbance of the "big jam" was for the sole purpose, as seen, of enabling the defendant to profitably utilize a quantity of the timber of which said jam was composed. Had said jam been allowed to remain intact, it is probable that the high waters of Jacoby creek brought about by the rains of the winter of 1906-7 could have been easily carried through its natural channel to Humboldt bay and thus the injury to plaintiff's leasehold avoided.

Some complaint is made of the verdict, the claim being that it is so excessive or far beyond a reasonable admeasurement of damages, under the circumstances as revealed by the evidence, that the same must have been given under the influence of passion or prejudice. (Code Civ. Proc., sec. 657, subd. 5.) We cannot say, from the face of the record, that this contention has any merit. It appears to us that the evidence amply justifies the amount of damages awarded. In any event, there is nothing in the record which would warrant this court in substituting its judgment upon that proposition for that of the jury and of the trial judge, to whom the question was no doubt fully presented on the motion for a new trial.

The judgment and order appealed from are, for the reasons herein expressed, affirmed.

Burnett, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 19, 1910.