[L. A. No. 18066. In Bank. Nov. 4, 1943.]

NATURAL SODA PRODUCTS COMPANY (a Corporation), Respondent, v. CITY OF LOS ANGELES et al., Appellants.

(Two Cases.)

194

Ray L. Chesebro, City Attorney, S. B. Robinson, Chief Assistant City Attorney, Samuel Poorman, Jr., Assistant City Attorney, Robt. E. Moore, Jr., and Rex B. Goodcell, Jr., Deputies City Attorney, and A. E. Chandler for Appellants.

Kenneth Ferguson and Jess G. Sutliff for Respondent.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, Everett W. Mattoon, Assistant Attorney General, and Gilbert F. Nelson and Burdette J. Daniels, Deputies Attorney General, as Amici Curiae on Behalf of Respondent.

TRAYNOR, J.—In 1913, the defendant city of Los Angeles completed its aqueduct to the Owens River Valley and, from 1919 to 1937, diverted into it virtually all the flow of the Owens River, which formerly emptied into Owens Lake, a body of salt water without outlet. As a result the lake dried up and its subsurface became a crystalline cake impregnated with brines containing valuable chemicals. On the shores of the dry lake plaintiff had two plants to which brines pumped from wells on the bed of the lake were piped for the production of soda products. Plaintiff acquired the older of the two plants in 1932, when it leased mineral rights in the lake from the State of California. Plaintiff subsequently extended its pipe lines several miles farther along the bed of the lake, drilled wells, and installed pumps and brine heaters, acquiring the necessary leases and rights of way from the state. The brines thus made available were of higher alkalinity and therefore of greater value than those previously obtained. To improve its efficiency in extracting chemicals from the brines so as to increase production, plaintiff built a new plant and adopted a new process.

Plaintiff's operations were possible because of the dehydrated state of the lake bed, the continuation of which depended on the absence of any substantial flow of water from Owens River into the lake. The extent of the flow was determined by the manner in which defendant operated its aqueduct. Its dam across Owens Valley, forming Tinnemaha Reservoir, served to regulate the flow of the river. Below the dam, the water, which flowed through its natural channel until it reached Intake, could be directed into the aqueduct proper by means of defendant's diversion dam, or into Owens Lake if the gates in the dam were opened.

On February 6, 1937, before plaintiff's new plant could be put into operation, defendant opened the gates at Intake, thereby causing a large amount of water to flow into the lake. Defendant continued to direct the water into the lake intermittently until July 1, 1937, and the surface of the lake became flooded to a depth of three or four feet. The water inundated much of plaintiff's plant, causing substantial physical damage and reducing the alkalinity, and therefore the value, of the subsurface brines by keeping them at a low temperature. As its properties were wholly inaccessible until July, 1937, and partly so until September, 1937, plaintiff was unable to resume operations until October, 1937. Defendant

released altogether approximately 50,000 acre feet of water into the lake. There was evidence that it could have stored some of this water in Tinnemaha Reservoir for later release down the Santa Clara River or onto the Mojave Desert, and could have spread the remainder in the Owens River Valley.

On December 17, 1937, plaintiff brought suit for an injunction. On December 30, 1937, plaintiff's claim for damages was received by the mailing clerk of the water department, and upon its rejection plaintiff filed its action for damages. These actions were consolidated for trial. The injunction was denied, and judgment was entered awarding plaintiff $153,578.85. From this judgment defendant appeals.

■ It is generally recognized that one who makes substantial expenditures in reliance on long-continued diversion of water by another has the right to have the diversion continued if his investment would otherwise be destroyed. (*Chowchilla Farms, Inc.* v. *Martin,* 219 Cal. 1 [25 P.2d 435]; *Matheson* v. *Ward,* 24 Wash. 407 [64 P. 520, 85 Am.St.Rep. 955]; *Pere Marquette Ry. Co.* v. *Siegle,* 260 Mich. 89 [244 N.W. 239]; *Mathewson* v. *Hoffman,* 77 Mich. 420 [43 N.W. 879, 6 L.R.A. 349]; *Kray* v. *Muggli,* 84 Minn. 90 [86 N.W. 882, 87 Am.St.Rep. 332, 54 L.R.A. 473]; *Peter* v. *Caswell,* 38 Ohio St. 518; *Delaney* v. *Boston,* 2 Har. (Del.) 489; *Shepardson* v. *Perkins,* 58 N.H. 354; *Hammond* v. *Antwerp Light & Power Co.,* 132 Misc. 786 [230 N.Y.S. 621, 634]; *Ford* v. *Whitlock,* 27 Vt. 265; *Smith* v. *Youmans,* 96 Wis. 103 [70 N.W. 1115, 65 Am.St.Rep. 30, 37 L.R.A. 285].) Thus in the Chowchilla Farms case the court held, in recognition of the rights of those with lands riparian to a changed channel, that the flow could not be returned to its former bed. ■ It has also been held that the rights of those who improve land previously submerged would be infringed if the land were submerged again. (*Matheson* v. *Ward, supra;* see cases collected in 88 A.L.R. 142, et seq.; *San Gabriel V. C. Club* v. *Los Angeles,* 182 Cal. 392, 397 [188 P. 554, 9 A.L.R. 1200].) A change in the flow of a stream that appears to be permanent usually leads to costly adjustments by those interested, as they come to regard the artificial condition as permanent. It is therefore reasonable that they should receive as much protection as if the condition were natural. (See *Chowchilla Farms, Inc.* v. *Martin, supra,* and cases there cited.)

Some jurisdictions do not afford this protection if the diversion can be continued only by maintaining a structure

such as a dam (*Drainage Dist.* v. *City of Everett,* 171 Wash. 471 [18 P.2d 53, 88 A.L.R. 123]), apparently because it would be an excessive burden for one to maintain a dam that is of no further use to him. When the owner maintains the dam but alters the flow to increase his profit at the expense of those below him, or merely to be arbitrary, it is reasonable to require that the alterations shall not injure those who have relied on the customary operation of the dam in the past. (*Kray* v. *Muggli, supra; Smith* v. *Youmans, supra; Pere Marquette Ry. Co.* v. *Siegle, supra; Hammond* v. *Antwerp Light & Power Co., supra;* see *Marshall Ice Co.* v. *La Plant,* 136 Iowa 621, 633 [111 N.W. 1016, 12 L.R.A.N.S. 1073]; *Greisinger* v. *Klinhardt,* 321 Mo. 186 [9 S.W.2d 978]; *Mitchell Drainage Dist.* v. *Farmers Irrigation Dist.,* 127 Neb. 484 [256 N.W. 15].)

█ In the present case defendant not only diverted the flow of the Owens River for many years, but augmented it by such activities as the digging of wells and drainage ditches, so that the diversion appeared to be permanent. The gates in defendant's dam did not dispel the impression of permanence, for it was evident from the continued dryness of the lake that they were kept closed. Reliance on the permanence of the diversion was therefore natural; moreover, it was highly desirable, for it motivated the development of natural resources of substantial value. The findings, amply supported by the evidence, establish that defendant could easily have found an outlet for the surplus water instead of causing it to flow into the lake. While the flow of water was unusually large for a brief period, it would have been within the capacity of the aqueduct had it been stored temporarily in available space, and gradually released where it could do no harm. Defendant attempted to prove that it released the water with a high boron content to lower the boron content of the water flowing into the aqueduct. There was evidence, however, that the boron content of the water used by defendant had never been high and that it was not substantially lowered by releasing the water. In any event, defendant could have released the boron-bearing water elsewhere. These findings are sufficient to establish liability, and it is therefore unnecessary to consider the additional finding that defendant was negligent in failing to construct sufficient headwater storage.

■ Defendant contends that since an appropriative right is limited by the needs of the appropriator (Cal. Const., art. XIV, sec. 3; Civ. Code, sec. 1411), it was under an obligation to release the water that it did not need into the Owens River channel at Intake. These constitutional and statutory provisions, designed to insure a reasonable division of a limited water supply, have never been construed as requiring a particular disposition of surplus water, least of all a disposition harmful to the recipient. The constitutional mandate forbidding "the waste or unreasonable use of water," far from requiring, actually forbids a disposition that would entail not only waste of water but damage to valuable natural resources.

■ Defendant also contends that as a riparian owner it had the right to the full flow of the Owens River past its lands below Intake. Such a right, however, would clearly exceed that allowed by the Constitution, which provides that "the right to water . . . shall be limited to such water as shall be reasonably required for the beneficial use to be served . . ." (Cal. Const., art. XIV, sec. 3), for defendant makes no claim that it has any beneficial use for the water.

■ In addition to other items, plaintiff was awarded damages for loss of profits, which defendant contends was not proved with certainty. The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. (*California P. Mfg. Co., Inc.* v. *Stafford Packing Co.*, 192 Cal. 479, 485 [221 P. 345, 32 A.L.R. 114] ; *Gibson* v. *Hercules Mfg. Co., Inc.*, 80 Cal.App. 689 [252 P. 780].) If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded. (*Sobelman* v. *Maier*, 203 Cal. 1, 9 [262 P. 1087] ; *Pacific etc. Co.* v. *Alaska Packers Assn.*, 138 Cal. 632 [72 P. 161] ; *Landon* v. *Hill*, 136 Cal.App. 560 [29 P.2d 281] ; *Pye* v. *Eagle Lake Lumber Co.*, 66 Cal.App. 584 [227 P. 193] ; *Hacker Pipe & S. Co.* v. *Chapman V. Mfg. Co.*, 17 Cal.App.2d 265 [61 P.2d 944].) In the present case plaintiff's probable gross receipts could be estimated from its sales in the preceding two years, in view of the evidence that prices

were stable. Its unit costs could be estimated on the basis of detailed figures concerning actual expenses, such as labor, depreciation, insurance, taxes, and royalties for the limited operations carried on in 1938. Its plant capacity was conservatively estimated at 90 tons per day, since plaintiff's old plant, using the ''carbonating process'' had a proved capacity of from 35 to 40 tons a day, and the capacity of the new ''Mono Process'' plant had been increased from 50 to 100 tons a day. Awards of prospective profits have been sustained on the basis of much less satisfactory evidence. (See *Pacific etc. Co.* v. *Alaska Packers Assn., supra; Shoemaker* v. *Acker,* 116 Cal. 239 [48 P. 62] ; *Hacker* v. *Chapman Mfg. Co., supra; Landon* v. *Hill, supra; Story Parchment Co.* v. *Paterson etc. Co.,* 282 U.S. 555 [51 S.Ct. 248, 75 L.Ed. 544] ; *Barrett Co.* v. *Panther Rubber Co.,* 24 F.2d 329.) Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated. (*Sobelman* v. *Maier, supra,* at p. 9; *Schumann* v. *Karrer,* 184 Cal. 50, 57 [192 P. 849] ; *Meer* v. *Cerati,* 53 Cal.App. 497 [200 P. 501].)

Defendant relies on the fact that in the years immediately preceding the flooding plaintiff did not make a profit. A comparable problem was presented in *Buxbaum* v. *G. H. P. Cigar Co.,* 188 Wis. 389 [206 N.W. 59], where the defendant broke a contract giving the plaintiff a right to sell cigars of the defendant's manufacture. Although no profit had previously been recovered from the sale of the cigars, the plaintiff was able to show that its expenses in the year the contract was broken were low enough to have permitted a gain from sales in that year, and recovery of prospective profits was allowed. In the present case plaintiff was engaged during the two years immediately preceding the tort in converting its plant, and it maintained its sales position by selling soda products purchased elsewhere. The court might well have concluded that profits were probable, since the completion of alterations enabled plaintiff to sell products from its own plant.

Defendant contends that plaintiff's damages should be determined on the basis of opinion evidence concerning the value of plaintiff's properties before and after the tort. While this method is the usual one for determining damages for trespass to real property, it yields to others if they are

more appropriate to a particular situation. (See McCormick, Damages, p. 482, et seq.; 15 Am. Jur. 514.) In the case of a reparable injury, a frequent measure of damages is the cost of making repairs plus the value of the use of the premises for the period during which the tort has deprived the owner of the property. (*Linforth* v. *San Francisco Gas & Electric Co.*, 156 Cal. 58 [103 P. 320, 19 Ann.Cas. 1230]; *Green* v. *General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475]; *Higgins* v. *Los Angeles Gas & Electric Co.*, 159 Cal. 651, 662 [115 P. 313, 34 L.R.A.N.S. 717]; *Kell* v. *Jansen*, 53 Cal.App.2d 498 [127 P.2d 1033].) Similarly, in the present case damages were given for the physical destruction resulting from the tort, and the value of the use of plaintiff's properties was properly estimated on the basis of the probable profits that would have been derived from their operation. Moreover, plaintiff's properties are a complex aggregation of real and personal property, of pumps, plant, pipe lines, and mineral rights. It is common knowledge that such plants do not frequently change hands, and that in a sale the price is likely to be based on considerations peculiar to the plant. Expert opinion as to the market value of such a plant is likely to be based on nothing more substantial than the probable returns from the operations of the plant. A more accurate assessment of damage can be obtained by estimating loss of profits directly. (*Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal.2d 525 [55 P.2d 850]; *Teller* v. *Bay & River Dredging Co.*, 151 Cal. 209 [90 P. 942, 12 Ann.Cas. 779, 12 L.R.A.N.S. 267]; *Sacchi* v. *Bayside Lumber Co.*, 13 Cal.App. 72, 73, 84 [108 P. 885]; see Weill, "*Value of the Use*" *in Non-Renting Localities*, 13 Cal.L.Rev. 373.)

Defendant invokes section 363 of the Charter of Los Angeles, providing that "Every claim and demand against the city shall be first presented to and approved in writing by the board, officer or employee authorized by this charter to incur the expenditure or liability represented thereby," and section 376, providing that "No suit shall be brought on any claim for money or damages against the City of Los Angeles, or any officer or board of the city, until a demand for the same has been presented, as herein provided, and rejected in whole or in part. . . . Except in those cases where a shorter period is otherwise provided by law, all claims for damages

against the city must be presented within six (6) months after the occurrence from which the damages arose. . . ." Plaintiff presented his claim by mailing a copy of it to the Department of Water and Power. Upon receiving it the mailing clerk of the department gave it to the chief clerk of the legal division, who forwarded it to the deputy city attorney in charge of water matters, and the latter sent it to the board of water commissioners, advising its rejection.

It is settled that the board of water commissioners is "the board . . . authorized by this charter to incur the expenditure" here involved. (*Douglass* v. *City of Los Angeles*, 5 Cal.2d 123, 134 [53 P.2d 353]; *Continental Ins. Co.* v. *City of Los Angeles*, 92 Cal.App. 585 [268 P. 920]; see *Huey* v. *City of Los Angeles*, 137 Cal.App. 48 [29 P.2d 918].) It is likewise settled that the requirement that a claim be presented to such a board is satisfied by presentation to a subordinate who represents the board for the receipt of such claims from the public. (*Douglass* v. *City of Los Angeles, supra; McCandless* v. *City of Los Angeles*, 10 Cal.App.2d 407 [52 P.2d 545]; *Sandstoe* v. *Atchison T. & S. F. Ry. Co.*, 28 Cal. App.2d 215 [82 P.2d 216].) It is the function of the board to supervise the water department, which operates the waterworks of Los Angeles and controls the water revenue fund (Los Angeles Charter, sec. 71; 220(1)(7)), and the members of the department are therefore the subordinates of the board and may represent it in receiving claims. (*McCandless* v. *City of Los Angeles, supra;* see *Douglass* v. *City of Los Angeles, supra,* at p. 134.) A claim may be presented by registered mail, as in the present case (see *Metcalf* v. *Metropolitan Life Ins. Co.*, 1 Cal.App.2d 481 [37 P.2d 115]), and the mailing clerk of the water department is the subordinate charged with receiving claims so presented. The fact that the claim passed through many hands before it was actually considered by the board of water commissioners signifies merely that the board wished to be advised of the merits of claims before considering them. Plaintiff's claim was therefore filed with the appropriate officer.

The question remains whether it was filed "within six months after the occurrence from which the damage arose." Beginning on February 6th, defendant opened the gates in its dam intermittently until the last day of June. The water reached its peak in May, and did not entirely dis-

appear until some time in September. The claim was filed on December 30th.

The principal purpose of the requirement that claims be filed is to provide the city with full information concerning rights asserted against it, so that it may settle those of merit without litigation. (*Western Salt Co.* v. *City of San Diego,* 181 Cal. 696, 699 [186 P. 345]; *Sandstoe* v. *Atchison T. & S. F. Ry. Co.,* 28 Cal.App.2d 215, 223 [82 P.2d 216]; see 18 Cal.Jur. 1109.) That purpose is best served if the entire sequence of events giving rise to the injury is regarded as the "occurrence from which the damage arose," for damages can be assessed accurately only when the sequence is completed and the total injury taken into account. Thus, in the present case the injuries continued to accumulate but were not entirely apparent so long as water remained on the lake bed. (See *Haigh* v. *City of Los Angeles,* 139 Cal.App. 595 [34 P.2d 779].)

Defendant contends that the case of *Powers Farms* v. *Consolidated Irrigation District,* 19 Cal.2d 123 [119 P.2d 717], requires a different construction of the charter provision. That case, however, involved a different statute, and since no claim had been filed the court was concerned with determining, not the time within which a claim had to be filed, but whether the presentation of any claim was required. To hold that plaintiff was required to present a claim for the entire damage to its property by September 6th, six months after the initial flooding established the inevitability of damages, would require an unreasonable construction of the language of the charter provision, for the last flooding contributed to the injury as well as the first, and it would therefore be inaccurate to say that the first flooding was "the occurrence from which the damage arose." Moreover, the lake was still partially inundated on September 6th, and some of the damage was yet to occur. Since plaintiff's plant was wholly inaccessible until July, and partly so until September, plaintiff would have had only a brief interval in which to ascertain and evaluate the damage and could hardly have prepared a claim by September 6th, in compliance with the charter provision that "No demand can be approved . . . unless it specify each several item, with the date and amount thereof." (Los Angeles Charter, sec. 368.) Hence, if plaintiff were required to present a claim by that date, the charter

would have the effect of denying plaintiff the right to recover for much of the injury to his property. The state Constitution, however, provides for the right to compensation for the damaging of property for the public use (Cal. Const., art. I, sec. 14). A municipality can prescribe reasonable procedures for the enforcement of this right (*Crescent Wharf etc. Co.* v. *City of Los Angeles*, 207 Cal. 430 [278 P. 1028]), but cannot enact legislation that would operate to prevent or unduly hamper the enforcement of such a right. (*Douglass* v. *City of Los Angeles*, 5 Cal.2d 123, 128 [53 P.2d 353]; *Geimann* v. *Board of Police Commrs.*, 158 Cal. 748 [112 P. 553]; see *Rafferty* v. *City of Marysville*, 207 Cal. 657, 665 [280 P. 118]; see 5 Cal.Jur. 780; 34 Am.Jur. 32.) The same considerations apply to defendant's contention that plaintiff was required to file its claim within six months from the day in May that the water reached its peak. Additional water was released after that day augmenting the injury.

 Defendant contends that plaintiff's rights are barred on the ground that it failed to comply with the statute providing that "whenever it is claimed that any person has been injured or any property damaged as a result of the dangerous or defective condition of any public street, highway, building, park, grounds, works or property, a verified claim ... shall be presented ... with the clerk ... of the legislative body of the municipality ... within ninety days after such accident has occurred." (Stats. 1931, p. 2475, Deering's Gen. Laws, 1937, Act 5149.) This statute is inapplicable, however, for the damage in the present case arose, not from the dangerous condition of any public property, but from defendant's acts. (*Ogando* v. *Carquinez G. School Dist.*, 24 Cal.App.2d 567 [75 P.2d 641]; *Jackson* v. *City of Santa Monica*, 13 Cal. App.2d 376 [57 P.2d 226].)

 Defendant invokes as statutes of limitation sections 315, 316, 320, 338(2), 339(1), and 343 of the Code of Civil Procedure. Sections 315 and 316 relate to the acquisition of title by adverse possession, but defendant has submitted no evidence that it has acquired such title. Section 320 relates to certain rights under Mexican Land Grants (see the note by the Code Commissioners in Code Civ. Proc. 1872, sec. 320) and is inapplicable here. Plaintiff's action was brought well within the period prescribed by the other sections.

The judgment is affirmed.

Gibson, C. J., Curtis, J., Carter, J., and Schauer, J., concurred.

SHENK, J.—I dissent. The prevailing opinion holds that the requirement that a claim be presented within six months "after the occurrence from which the damages arose" is met when the claim is presented within six months after the last of a series of occurrences which caused the damage, and, presumably, that recovery may be had for the entire damage including the damage arising from acts occurring more than six months prior to the presentation of the claim. I agree that a claim may properly be presented within six months from the last occurrence giving rise to damage, but I do not agree with the holding that recovery may be had for damage arising from occurrences which happened prior to the beginning of the six months' period.

The purpose of the requirement for filing claims is not only to provide the municipality with information so that it may settle claims without litigation. Another very important purpose, in a case of continuing damage, such as the present one, is to give the city an opportunity to provide protection against damage by the continued acts complained of, should it deem itself liable. Therefore the rule stated in *Powers Farms* v. *Consolidated Irr. Dist.*, 19 Cal.2d 123, 129 [119 P. 2d 717], that "where the time and extent of injury are uncertain, a statutory period of limitations begins to run when the fact that damage is occurring becomes apparent and discoverable, even though the extent of the damage may still be unknown," has a sound basis in reason and justice. If, as was apparent in the present case, a continuation of the acts would result in a loss to the plaintiff, either total or partial, both reason and justice required that the municipality be apprised of the first occurrence causing damage at least within the time required by law, rather than that the plaintiff be permitted to remain silent until the damage mounted to a total loss. To hold the plaintiff thus to the requirement is not at all to effect a disregard of the language of the charter provision. On the contrary, it is a compliance with the plain terms thereof. It does not follow that to require compliance would be to deprive the plaintiff of a constitutional right to compensation for damaging private property for public use. It is settled that although the constitutional provision is self-

executing, the legislature may properly set up a procedure
for the recovery of the damages, and that the filing of a claim
within a specified period of limitations is a proper step in
such procedure. "Although the Constitution grants the
right to compensation, it does not specify the procedure by
which the right may be enforced. Such procedure may be
set up by statutory or charter provisions, and when so es-
tablished, a failure to comply with it is deemed to be a waiver
of the right to compel the payment of damages." (*Powers
Farms* v. *Consolidated Irr. Dist., supra,* 19 Cal.2d 123, 126
[119 P.2d 717]; *Davis* v. *East Contra Costa Irrigation Dist.,*
19 Cal.2d 140 [119 P.2d 727]; *Rose* v. *State of California,*
19 Cal.2d 713, 725 [123 P.2d 505]; *Crescent Wharf & Ware-
house Co.* v. *Los Angeles,* 207 Cal. 430 [278 P. 1028]; *Los
Angeles Athletic Club* v. *Long Beach,* 128 Cal.App. 427 [17
P.2d 1061].)

Appellants' petition for a rehearing was denied Decem-
ber 2, 1943. Shenk, J., and Edmonds, J., voted for a re-
hearing.