[Civ. No. 2301. Third Appellate District.—May 3, 1921.]

## JOSEPH GUIDERA, as Administrator, etc., Respondent, v. ROSARIO LAPIANA, etc., Appellant.

[1] NEGLIGENCE—ACTION FOR DEATH—PLEADING—CAPACITY OF PLAINTIFF.—A complaint in an action for damages for death is not obnoxious to the objection that it cannot be ascertained therefrom whether the plaintiff is suing as one of the heirs of deceased or as administrator of his estate, where the heirs of the deceased are named in the complaint and a person of plaintiff's name is mentioned as one of such heirs.

[2] ID.—ALLEGATION OF HEIRS OF DECEASED.—Since an action based upon section 377 of the Code of Civil Procedure was intended by the legislature to inure exclusively to the benefit of the heirs of a person whose death has been caused by the wrongful or negligent act of another, it is necessary in the pleading of such an action by the administrator or executor to show that there are heirs of the deceased.

[3] ID.—SUFFICIENCY OF ALLEGATION.—While it is well directly to state in the complaint in an action by the representative of the deceased for damages for death that the heirs named therein are all the heirs, the complaint is sufficient in that particular where it at least discloses the fact that there are heirs, naming them, without specifically stating whether those so named constituted all of the heirs.

[4] ID.—EVIDENCE—CURE OF DEFECTIVE COMPLAINT.—Assuming that a complaint for damages for wrongful death was defective in failing to state that the persons named were all of the heirs of the deceased, such defect was cured by the testimony of the plaintiff, to which no objection was made, that the persons named in the complaint were all of the heirs.

[5] ID.—KILLING BY SHOOTING—TESTIMONY OF WIFE OF DECEASED.— In an action brought under section 377 of the Code of Civil Procedure for damages for the wrongful death of a person, it was not error to deny a motion to strike out the testimony of the wife of the deceased that she saw the defendant "shoot and kill"

her husband, as involving the conclusion of the witness, where such statement was followed by testimony showing the manner in which the deceased was killed.

[6] ID.—PRESUMPTION OF INNOCENCE—APPLICABILITY IN CIVIL CASES. The presumption of innocence obtains in civil as well as in criminal cases, and when in a civil action a party is charged with crime, the evidence should be sufficient to overcome the presumption of innocence.

[7] ID.—INAPPLICABILITY OF RULE TO APPELLATE COURTS.—The rule as to the presumption of innocence is one particularly applicable to the trial court, for where there is credible evidence or evidence not inherently improbable which, to a reviewing court, appears to have justified the verdict or findings, the question whether the presumption has been overcome by the requisite degree of proof is foreclosed by the decision or verdict.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

S. Luke Howe and John J. Bauer for Appellant.

Dunn & Brand and Seymour & Downey for Respondent.

HART, J.—This action is by the administrator of the estate of the above-named deceased against the defendant for damages in the sum of fifty thousand dollars, for causing wrongfully the death of said deceased. (Code Civ. Proc., sec. 377.) The case was tried by the court, without a jury, and findings and judgment were in favor of the plaintiff in the sum of fifteen thousand dollars. The appeal is by the defendant from said judgment.

The points urged against the legal integrity of the judgment are: 1. That there was error in the order overruling the demurrer to the complaint on the ground of uncertainty, in that it cannot be ascertained from said pleading whether the plaintiff is suing as one of the heirs of deceased or as the administrator of his estate, and further, that it cannot be determined therefrom whether the parties named therein as heirs at law of deceased are all the heirs of said deceased; 2. That the overruling of the objection to certain testimony given by a witness for the plaintiff was error and prejudicial to the rights of the defendant; 3. That the evi-

dence is insufficient to support the findings and the judgment.

[1] 1. The complaint is not obnoxious to the objection urged against it. A reasonable view of the complaint in its entirety can lead to no other conclusion than that plaintiff, as administrator of the estate of the deceased, instituted the action for and on behalf of the heirs of the deceased. This is shown by the naming in the complaint of the heirs of the deceased, of whom it is safe to assume he is one, since a person of his name is also mentioned in the complaint as one of such heirs.

[2] The objection that the complaint does not specifically state that the parties named therein as heirs of the deceased are all the heirs of the deceased is devoid of substantial merit. It is true that an action based upon section 377 of the Code of Civil Procedure was intended by the legislature to inure exclusively to the benefit of the heirs of a person whose death has been caused by the wrongful or negligent act of another, and, consequently, in the pleading of such an action by the administrator or executor of the estate or will of the deceased, it is necessary to show that there are heirs of the deceased, otherwise such personal representative, who in such a case is only the statutory trustee to recover damages for the benefit of the heirs, has no right of action. (*Webster* v. *Norwegian Mining Co.*, 137 Cal. 399, 400, [92 Am. St. Rep. 181, 70 Pac. 276]; *Jones* v. *Leonardt*, 10 Cal. App. 284, 286, [101 Pac. 811]; *Munro* v. *Pacific Coast Dredging etc. Co.*, 84 Cal. 515, [18 Am. St. Rep. 248, 24 Pac. 303]; *Ruiz* v. *Santa Barbara Gas etc. Co.*, 164 Cal. 188, 192, [128 Pac. 330]; *Hirsch* v. *James S. Remick Co.*, 38 Cal. App. 764, [177 Pac. 876].) [3] While we think it would be well enough directly to state in the complaint in such an action by the representative of deceased that the heirs named therein are all the heirs of the deceased, still we think a complaint is sufficient in that particular where, as here, it at least discloses the fact that there are heirs of the deceased, naming them, without specifically stating whether those so named constitute all the heirs. But, if it were necessary in such a case as this that all the heirs of the deceased should be named or shown by the complaint, it is clear that, grammatically construed, the averment in the complaint here as to the heirs shows

that those named therein are *all* the heirs of deceased, since the averment is introduced by the definite article "the," thus: "*The* heirs of the said Victor Guidera are," naming them, thus limiting the number of the heirs of deceased to the number named in the averment and necessarily implying that all his heirs are so named. Obviously, the averment is radically different in meaning (viewing it from a grammatical standpoint) from what it would be if it were to read: "Annie Guidera, Frank Guidera and Joseph Guidera are heirs of the deceased." [4] There is, however, another reason against the reversal of the judgment because of the action of the court in overruling the demurrer, assuming that the complaint is defective in the respect in which we are now considering it, and that is that the asserted defect was cured by the evidence. The plaintiff, as a witness, was asked who the surviving heirs of the deceased were at the time of his death, to which question he replied: "Why, my mother, my brother Frank and myself." From this testimony, to which no objection was interposed, as legitimately none could be, it is clear that, since he named those only who are mentioned in the complaint as such heirs, there are or were at the time referred to no other heirs than those named in said pleading.

2. The two remaining assignments relate to the evidentiary competency and effect of the testimony given by the widow of deceased of the circumstances leading to the death of her husband, and may be considered together.

It appears that the deceased, at about 7 o'clock of the evening of September 22, 1917, was called from his home in the city of Sacramento by someone and that, on stepping out of his house and to the sidewalk fronting the same, he was shot and killed. That the death of Guidera was produced by a gunshot wound is conclusively shown by the autopsy record of the coroner of Sacramento County, admitted in evidence on the express stipulation of the attorneys of the respective parties, and which record contains the result of the autoptical examination of the body of the deceased by Dr. C. B. Jones, physician and surgeon to the coroner. This record discloses that two shots were fired into the body of deceased, viz., one through the lower jaw and one below the right angle of the mouth, "direction slightly downward and backward. Bullet removed from

between 4 and 5 cervical vertebrae; cause of death, bullet wound through neck and vertebrae, injuring spinal cord and carotid artery.''

The only witness to the shooting causing the death of deceased who testified in this case was the widow of deceased. Being unable to speak English or our language so that she could be plainly understood, she gave her testimony through an interpreter, who, it seems, was also deficient to some extent in ability to speak the English language, although sufficiently familiar with the use of that language to enable him to translate the witness' testimony so that it would be understood.

Mrs. Guidera, in substance, testified (and we are taking this statement from both her direct and cross-examination) that, early in the evening of September 21, 1917 (stated in the complaint as the twenty-second day of September, 1917), some voice called out from the outside for her husband; that, hearing the call, the deceased immediately started to go outside, and that she followed him and saw the defendant outside near the door. She stated that she was acquainted with the defendant. She proceeded to testify on direct: ''I hear shooting; I only saw him [her husband] lay down on the floor; I only hear shooting, then I went out, find my husband lying down on the floor. The Court: Did you see this Lapiana [referring to defendant] shoot the gun—what kind of an instrument did he have, a pistol, rifle, or a shotgun? A. I saw him, but I did not see what he had in his hand. Q. Was it some kind of a gun? A. I don't know; I didn't see it. Q. Did you see him shoot anything? A. I just saw him shooting, and my husband drop on the floor. Q. Did you see Rosaria Lapiana shoot your husband? A. I see it. Q. What did you see? A. I saw him shooting, go away. Q. What happened to your husband after the shooting? A. He died.'' On cross-examination, the witness stated that both she and her husband were in the kitchen of their house when they heard a voice outside calling for the deceased; that her husband started out, opening the front door and stepping outside and leaving the door open, and that she immediately followed him outside. Q. ''When was the first time you saw Mr. Lapiana? A. Just at the time he killed my husband.'' Continuing (on cross-examination) she said that Lapiana

was on the sidewalk on the outside of their yard; that her
husband passed through the gate to the outside and she
remained within the yard, near the gate; that defendant
was standing near a tree, only a few feet from the gate,
and that her husband went to where defendant was stand-
ing; that almost immediately she heard three pistol shots,
likewise followed by the falling of her husband to the
ground; that thereupon the defendant, with two other
men, one of them a brother of defendant, whom she did
not observe until the shots were fired, ran away.

In addition to the testimony thus referred to, it was
shown by circumstances that the defendant fled from the
city or, at any rate, had not, down to the date of the trial
of this action, been apprehended or captured. The service
of the summons in this action was, so it appears from the
record, by publication.

[5] The witness, Mrs. Guidera, it will be observed, tes-
tified that she saw the defendant shoot and kill her husband.
The defendant, by his counsel, moved to strike out the tes-
timony on the ground that it involved the conclusion
of the witness. The court denied the motion, and it is
here claimed, as above intimated, that the action of the
court on said motion was erroneous and that the testi-
mony to which the motion was addressed operated preju-
dicially against the vital rights of the defendant in the
trial and decision of the case. We think the motion was
properly denied. If, in the prosecution of either a civil
case for damages or a criminal case directly growing out
of a battery committed by the defendant, a witness should
testify that he saw the defendant strike the complainant
and knock him to the ground, we do not think it would be
for an instant claimed that such testimony would involve
the mere conclusion of the witness so testifying or anything
less than the statement of a probative fact. We can
perceive no distinction, in character or quality, between
the statement of the witness in this case that she saw the
defendant "shoot and kill" her husband and the statement
of the witness in the supposititious case that he saw the
defendant "strike and knock down" the complainant. But
it is conceded by counsel for the defendant that the state-
ment complained of may constitute the statement of a
fact "if followed by testimony showing in what manner

52 Cal. App.—30

defendant shot her husband or killed her husband." While
the witness was unable to state what character of weapon
was used in the slaying of her husband, she did testify,
as we have seen, that she heard shots and that her hus-
band fell to the ground immediately following said shots.
The autopsy physician, as shown, testified that he found
two wounds in the body of the deceased and that the latter's
death was caused by those wounds or one of them. These
circumstances clearly showed that the plaintiff's intestate
was killed by gunshot wounds inflicted upon his body,
and the fact that defendant was present when the shots
were fired into the body of the deceased, the further fact
that he was the only person seen near the deceased when the
shots were fired, and the additional fact that he immediately
fled after the shots were fired and the deceased fell to the
ground, are circumstances from which the trial court could
reasonably and justly infer and conclude that the defendant
was the slayer of the deceased. Thus it is manifest that
the statement of the witness that she saw the defendant
"shoot and kill her husband" was followed by testimony
"showing in what manner defendant shot and killed her
husband"—that is, that the slaying was committed by the
defendant by means of a loaded firearm, the particular na-
ture of which the witness was not able to say.

The above consideration of the evidence, although for
the purpose of reviewing the order of the court denying
defendant's motion to strike out the testimony adverted to,
constitutes a sufficient answer to the point that the findings
and the judgment find no evidential support in the record.
But there is another circumstance to which, in the present
connection, reference should be made. Mrs. Guidera testified
that, when her husband approached the defendant after he
(deceased) stepped through the gate leading to and from
his premises to the sidewalk and was near the defendant,
she observed, before the first shot was fired, that the de-
fendant held a coat on his right arm. While there is no
evidence that defendant fired the weapon with his right
hand, and, in fact, no evidence as to which of his two
hands he used for that purpose, it may be assumed, and
the court below had the right to assume, from the general
and customary and, indeed, natural manner in which such
acts are done, that the defendant used his right hand

when discharging the weapon into the body of deceased; and from the circumstance that the defendant held over or on his right arm ánd hand a coat of some description, the trial court was authorized to infer that the defendant had the weapon with which he did the shooting concealed under the said coat when the deceased approached near enough to him to have observed the weapon if it had been exposed to view in his unconcealed hand. And, if drawing that inference, the .court could justly have further drawn the inference that the purpose the defendant had in so concealing the weapon was to keep the deceased in ignorance of the purpose of his (defendant's) presence there until such purpose had been accomplished.

But it is contended by counsel' for defendant that the evidence, even though it may tend in a degree to establish the allegation of the complaint, does not measure up to the requirement of the rule in cases such as this in which the issue involves a charge of moral turpitude. The rule referred to is stated by Mr. Jones in his work on Evidence, volume 2, section 195, as follows: [6] ''The presumption of innocence obtains in civil as well as in criminal cases; hence when in a civil action a party is charged with crime, the evidence should be sufficient to overcome the presumption of innocence; that for this purpose more evidence may be necessary than in ordinary cases. . . . To create a preponderance of evidence, the evidence must be sufficient to overcome the presumption of innocence.''

[7] The rule, as stated, is undoubtedly sound, but as a general proposition it is one that has particular application in the trial of the case in the trial court and not in the consideration of the case on appeal. Where, either in a civil or criminal case, there is credible evidence, or evidence not inherently improbable, which, to a reviewing court, appears to have justified the verdict or findings, then the question as to the side upon which the preponderance of the evidence lies or whether the presumption of innocence has been overcome by the requisite degree of proof in such case is foreclosed by the decision below or the verdict. In other words, where the evidence as disclosed by the record on appeal is such that a reviewing court is legally justified in holding that it is sufficient to support the findings or the verdict, as the case may be, then

it must be assumed that as to a civil case the trial court or the jury found upon the question of the preponderance of the evidence in favor of the victorious party or, as to a criminal case, found that by such evidence the presumption of the innocence of the defendant was dispelled and his guilt satisfactorily established. The proposition thus stated necessarily follows from the different viewpoints from which questions of fact must be reviewed and determined at *nisi prius* and by courts· of appeal. The latter, in the very nature of things, cannot pass upon the question of the credibility of witnesses and consequently upon the weight of testimony. That is essentially the sole function of the jury or the trial court. The books are replete with cases in which the records on appeal show that the evidence upon which the findings and the verdicts are predicated is apparently very slight, and yet such findings and verdicts have been upheld by the appeal courts because, for the reason stated, it is not within either the province or the power of such courts to determine upon which side in a civil case the evidence preponderates or whether, in a criminal case, the evidence is such as justly to have persuaded in the minds of the jury the conviction of the defendant's guilt beyond a reasonable doubt. In such a case, therefore, as stated, courts of review must leave the question of preponderance or the question of guilt where the court or jury has placed it. So, in the instant case, there being sufficient evidence to support the findings of the trial court, it must be assumed and, indeed, presumed, that, in reaching its decision, as crystallized in its findings, the court below was guided by all the tests whereby the weight and evidentiary force of testimony must be determined and was persuaded to its conclusion by the degree of proof essential in such a case and which appears to be amply afforded by the evidence.

The judgment is affirmed.

Finch, P. J., and Burnett, J., concurred.