[Civ. No. 2234.  Third Appellate District.—July 13, 1921.]

JOHN H. MEER, Respondent, v. C. M. CERATI et al., Appellants.

[1] LANDLORD AND TENANT—BREACH OF LEASE OF FARM LANDS—AGREEMENT OF DEFENDANTS—PLANTING OF CROP—PLEADING—SUFFICIENCY OF COMPLAINT.—In an action by a lessor for damages for an alleged breach of a written lease of farming lands, the complaint is not subject to general demurrer for failure to allege in the body thereof that the defendants agreed to plant the lands to rice or to any crop, where the lease is made a part of the complaint by express averment and annexed thereto as an exhibit, and the complaint alleges that defendants did not cultivate and did not sow any part of said lands to rice as in said lease provided.

[2] PLEADING—WRITTEN INSTRUMENT—REFERENCE.—When a written instrument upon which the plaintiff declares or the defendant bases his defense is by sufficient reference in the pleading made a part thereof, such instrument becomes as much a part of the pleading as though it had been *in haec verba* incorporated into the body thereof.

[3] ID.—ANSWER—CURE OF DEFECT IN COMPLAINT.—Where in such an action the answer makes the question whether the defendants agreed to cultivate and plant the land to crops as provided in the lease an issue in the case by admitting that they did not sow or plant the same and stating facts purporting to justify such failure, any defect in the complaint in such regard is thereby cured.

[4] ID.—EVIDENCE—CURE OF DEFECTIVE COMPLAINT.—Where in such action evidence is admitted without objection that the defendants had failed to comply with the covenants and terms of the lease which also was admitted without objection, any defect in the complaint as to failure to allege an agreement to plant and cultivate crops is thereby cured.

[5] ID.—PLANTING OF OATS AND RICE—TIME OF COMMENCEMENT OF ACTION FOR BREACH.—An action for damages for breach of a lease of lands for the crop season of 1919 brought July 5, 1919, is not premature where the crops were rice and oats, since the cropping season, so far as the planting of such crops was concerned, was then ended.

[6] ID.—DAMAGES—EVIDENCE—PROBABLE RICE YIELD—EXPERTS.—Testimony given by experts as to the probable yield of rice on the lands in question for the year 1919 was competent.

[7] ID.—FUTURE PROFITS—WHEN RECOVERABLE.—Damages based upon future profits which are the natural and direct consequence of the breach of a contract and not collateral to the subject matter thereof are recoverable.

APPEAL from a judgment of the Superior Court of Sutter County. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

Martin Stevens and A. Caminetti, Jr. for Appellants.

J. M. Inman for Respondent.

HART, J.—This action is by the plaintiff to recover damages in the sum of $2,500 alleged to have been suffered by him from the alleged breach by the defendants of a certain instrument in writing whereby the plaintiff let or leased certain premises for and during the crop season of the year 1919 to defendants.

The cause was tried by the court, sitting without a jury, and judgment for damages in the sum of $2,310 was awarded plaintiff.

The defendants appeal from said judgment under the alternative method.

By the said instrument the plaintiff leased to the defendants certain land embraced within what is known as the Watt's Nicolaus Acres, Sutter County, and consisting of 98.98 acres for the cropping season of the year 1919. The portions of the writing which are particularly pertinent to the inquiry here read as follows:

"That they [lessees] will in due and proper season sow said premises to approximately one third or more to rice, and the remainder thereof to oats, and will harvest the same at their own cost, charge and expense, as soon as the same is suitable for harvesting. That they will, immediately upon harvesting the same, as and for the yearly rental of said premises, deliver to said party of the first part at Railroad station at East Nicolaus, one third part of all oats crops and one fourth part of all rice crops raised, upon said demised premises. That the portion thereof sowed to rice shall be kept free from water grass and other noxious weeds; that said second parties shall furnish and pay for

all water used, and pay all other expenses connected with the growing of all the crops on said premises, . . . And it is mutually covenanted and agreed that until such delivery shall be made as aforesaid, the party of the first part shall have a lien and charge upon the entire crop of grain to the amount of $1000.00 Gold Coin, estimated and fixed, and for the purpose of securing said party of the first part for the use and rental of said premises yearly and every year as the value thereof, the party of the first part reserves the right to enter upon the premises at any time to make examination of the premises and crops. And if he shall at any time deem himself insecure and unsafe in the matter of the rental, he may take immediate possession of the leased premises to secure or harvest the crop and may dispose of the same by sale or otherwise, accounting to the parties of the second part for any excess realized by him over and above the rental or use of said premises; and all expenses incurred or paid to secure, harvest and make sale of the crop.''

The complaint alleges:

"II.

''That on the 4th day of January, A. D. 1919, plaintiff and defendants entered into one certain lease, a copy of which lease is hereto annexed, marked 'Exhibit A.' and by reference made a part of this complaint.

"III.

''That pursuant to the terms of said lease, defendants entered into possession of the premises described therein, and are now and at all the times herein mentioned have been in continuous possession of said premises.

"IV.

''That defendants did not cultivate said premises and did not sow one third thereof, or any part thereof, to rice as in said lease provided, and that defendants did not plant the remainder or any part of said premises to oats as in said lease provided, and did not plow or plant said premises or any part thereof to rice, oats or to any other crop, and that the season for planting said crops or any of them has passed, and it is now too late to successfully put in any crop upon said premises.

"V.

''That by reason of the failure of defendants to conform to the terms of said lease by planting said crops as therein

provided, plaintiff has been damaged in the sum of twenty-five hundred dollars."

To the complaint the defendants interposed on the general ground a demurrer, which was overruled.

Answering the complaint, the defendants deny that they were at the date of the commencement of this action or at any time before or since have been in the possession of the lands and premises "in said complaint referred to or any part or portion thereof"; admit that they did not cultivate said premises and did not plant any said lands to rice or oats or to any crop whatsoever; but set up as an excuse for not so cultivating and planting said lands the fact that the plaintiff, having at the time of the making of said lease agreed with defendants to furnish and provide the demised premises with sufficient wells to irrigate the same for rice growing, wholly failed to keep or carry out said agreement, with the result, there being no other source or sources from which the necessary water could be obtained for irrigating the same for rice growing purposes, that it was impossible to grow or produce any rice thereon; that upon said lands there was but one well, but it was totally inadequate, in the condition in which it was then and at all times, properly to irrigate said lands or any material portion thereof; and "plaintiff declined and refused to increase the capacity of said well or bore or dig any other wells, or in any way to provide a water supply for defendants in cropping said lands." The answer states, by way of further excuse for the failure of defendants to cultivate and plant said lands as provided in the agreement of lease, that, although said lease bears date January 4, 1919, as a matter of fact, it was not executed until about the middle of February, 1919, after which date the condition of the weather was such, due to rainstorms, that the said lands "could not be plowed or cropped until a date entirely too late to permit the growing thereon of any crop; as a result nothing was grown upon said lands but a crop of hay of approximately thirty-five tons, of which plaintiff received approximately twenty-five tons." Upon these averments, the answer finally charges that the failure to grow a rice crop or any crop upon said lands during the term of said lease "was due wholly to the fault of plaintiff."

The agreement of lease having been entered into at a time when it was too late to sow oats on the lands, the plaintiff at the trial waived all claim for damages for the failure of the defendants to plant the lands to oats.

The defendants claim that they are entitled to a reversal of the judgment for these reasons: 1. That the complaint does not state a cause of action because it fails to allege in the body thereof that the defendants agreed to plant the land to rice or to any crop; 2. That the evidence does not support the findings; 3. That the evidence adopted by the court as the basis for fixing the damages awarded is "too speculative, uncertain, and conjectural" to constitute a legal criterion for the damages allowed; 4. That the lease itself provides for and fixes the amount which shall be paid to plaintiff by defendants as rental for the land in case no crop was planted thereon; 5. That the action was prematurely brought; and 6. "That the decision is against law and that the measure of damages adopted by the court was erroneous."

[1] 1. The order overruling the demurrer was not erroneous. The lease is by express averment in the complaint made a part thereof and is annexed thereto as an exhibit. The pleading, as will be observed, then alleges that defendants "did not cultivate said premises and did not sow one-third thereof, or any part thereof, to rice, *as in said lease provided,*" etc. This allegation, even if defective in form, was sufficiently aided by the lease itself to overcome the effect of a general demurrer. [2] The general rule is that when a written instrument upon which the plaintiff declares or the defendant bases his defense is by sufficient reference in the pleading made a part thereof, such instrument becomes as much a part of the pleading as though it had been, *in haec verba,* incorporated into the body of the pleading. (*Lambert* v. *Haskell,* 80 Cal. 612, [22 Pac. 327]; *Georges* v. *Kessler,* 131 Cal. 183, [63 Pac. 466]; *Ward* v. *Clay,* 82 Cal. 506, [23 Pac. 50, 227]. See, also, the concurring opinion of Mr. Justice Temple in *Hibernia Sav. etc. Soc.* v. *Thornton,* 127 Cal. 575, [60 Pac. 37]; *Santa Rosa Bank* v. *Paxton,* 149 Cal. 195, 198, [86 Pac. 193].)

In the last-named case, Mr. Justice Shaw so states the rule in the following manner: "The rule that a written instrument upon which a cause of action is founded may be

pleaded either by setting forth its substance according to its legal effect, or by incorporating a copy in the body of the complaint, or by attaching thereto, by a proper reference, a copy of such instrument, as the pleader may choose, is thoroughly established in this state,'' citing a number of cases, among which are those above cited.

The most that can be said of the complaint in this particular is that it is defective in form—that is, defective in the statement of the fact sought to be alleged. In *Estate of Cook*, 137 Cal. 184, 191, [69 Pac. 968], it is said that ''if the allegation be defective it may be aided by an express reference to an exhibit for that avowed purpose.'' We must construe the language of the complaint here making the lease a part thereof as making it a part of that pleading for all the purposes of a pleading.

The cases cited by the appellant, to wit: *City of Los Angeles* v. *Signoret,* 50 Cal. 298, *Burkett* v. *Griffith,* 90 Cal. 532, 541, [25 Am. St. Rep. 151, 13 L. R. A. 707, 27 Pac. 527], *Ahlers* v. *Smiley,* 11 Cal. App. 343, [104 Pac. 997], and *Hayt* v. *Bentel,* 164 Cal. 680, [130 Pac. 432], are different in the facts from this case.

In *Los Angeles* v. *Signoret,* the action was for the enforcement of a lien for an assessment on a lot in the city plaintiff levied for the construction of a sewer. The complaint merely alleged that the lien accrued in favor of plaintiff by reason of facts set out in a notice and claim of lien, recorded in a certain designated book in the recorder's office of Los Angeles. There were no averments in the complaint that the requisite jurisdictional steps under the statute had been taken by the governing body of the plaintiff to create and enforce a lien. The notice of lien, however, contained a recital of the various steps required for that purpose, and upon said notice and its recitals the pleader relied, having made the notice a part of the complaint. The court held that the jurisdictional facts should have been expressly pleaded in the complaint. The specific reason upon which the ruling was founded is not given in the opinion; but we can readily perceive why such strictness in pleading the facts in such a case should be required, since the action is virtually for the enforcement of the payment of a tax upon the property of an individual and the proceedings culminating in the levy of the assessment and the lien are

*in invitum* and must, therefore, be affirmatively shown to have been followed in substantial strictness with the requirements of the statute authorizing the work and the levy of an assessment therefor upon the property affected.

In *Burkett* v. *Griffith,* the action was for damages against defendant for maliciously disparaging or slandering, by certain false statements, the plaintiff's title to certain property in Los Angeles County. The leases whereby the plaintiff acquired his interest in said property were attached to and by proper reference in the complaint made a part thereof. The complaint itself contained no allegations disclosing the nature or extent of plaintiff's leasehold interest, or the terms of his option to purchase, "or what were the covenants of his leases, or the nature of his rights thereunder, nor has he alleged that the covenants or the option are those which are contained in the exhibits." It was held that in the absence from the body of the complaint of those and certain other indicated allegations of fact, it could not be determined whether the plaintiff had in fact been damaged by the alleged defamatory statements relative to his title to whatever interest he had in the property supposed to be affected thereby. There is, however, some general language in the opinion in that case which might be regarded as lending support to the position of the appellant here, but we are justified in saying that if by the use of the general language referred to it was the intention to hold that the rule as therein applied is to have general or indiscriminate application in cases where the contents of an exhibit attached to and made a part of the complaint are relied upon as stating some of the facts essential to the statement of a cause of action, the opinion in that case has not in that particular been followed by the subsequent cases dealing with a like question, some of which are cited above.

In *Hayt* v. *Bentel,* the action was to recover back certain installments paid by plaintiff to defendant under a contract for the sale of a certain lot, containing a provision that, on default by plaintiff in the payment of any installment, the defendant might, at his option, declare the whole of the purchase price due, re-enter and take possession and retain as rent all moneys paid by plaintiff as installment payments on the purchase price. A defective title to the property was discovered, which was at all times known to

exist by defendant and unknown to plaintiff until just prior to the serving of a notice of rescission of the contract by plaintiff on defendant. The contract was annexed to the complaint and by reference made a part thereof. The point was made by defendant that "since, under the contract, the plaintiff was entitled to possession of the premises, her notice of rescission was ineffectual for want of an offer to restore such possession." But to this point the court well replied that there was no allegation either in the complaint or answer that plaintiff ever did take or receive possession, and, of course, the contract itself could not show that fact.

In *Ahlers* v. *Smiley,* the action was for damages for the breach of a contract by which the defendants agreed to buy ice from plaintiffs for the term of two years at a price per ton stipulated in the contract. Previously to the institution of said action plaintiffs brought suit and therein obtained judgment for an injunction enjoining defendants from purchasing ice from other persons than plaintiffs during the term of their contract. In the later action, plaintiffs alleged in their complaint the filing of the complaint, the answer thereto, the findings and judgment in the action for injunctive relief, and attached copies of all the papers constituting the judgment-roll therein to his complaint for damages. The contract was not set out in the latter complaint, "nor was it therein alleged that the plaintiffs ever executed or made any contract whatsoever to supply defendants with ice." Obviously, under such circumstances, it could not well be said that the contract, even though a part of the judgment-roll in the injunction suit, was pleaded in the later suit either directly or as an exhibit by proper reference.

[3] But there are two other answers to the point that the complaint, for the reason explained, is wanting in sufficient facts. The first of these is that the answer itself, as will be noted from the above reference to its contents, practically makes the question whether the defendants agreed to cultivate and plant the lands to the crops mentioned, as provided by the lease, an issue by directly admitting that "they did not sow one-third or any thereof [the premises described in the lease] to rice," and that they did not "plant any of said lands to oats or to *any crop whatsoever,*" following which admission was the statement of facts pur-

porting to justify such failure. It is perfectly clear from
the nature of the defense thus set up in the answer that
the pleader, when drafting his answer, regarded the com-
plaint as sufficiently clear and explicit to enable him to
answer all the vital issues it sought to submit, as he seems
to have had no difficulty in meeting both negatively and
affirmatively every essentially issuable fact that could arise
in the case in any state of the pleadings. (See *Dennis* v.
*Crocker-Huffman Co.,* 6 Cal. App. 58, 61, [91 Pac. 425].)
Indeed, the answer, as to the breaching of the lease by
failure to cultivate and plant the lands as provided therein,
is, as above indicated, in the nature of a plea by way of
confession and avoidance—that is, an admission of the obli-
gation resting on defendants to so plant the lands, the
breach of said obligation and an asserted valid excuse for
not executing it. Thus a case of "express aider" in plead-
ing is presented. (*Cohen* v. *Knox,* 90 Cal. 266, 275, 276,
[13 L. R. A. 711, 27 Pac. 215] ; *Donegan* v. *Houston,* 5 Cal.
App. 626, 632, [90 Pac. 1073].)

[4] The second answer to the point is that, conceding
the validity of the charge that the complaint is deficient in
the respect pointed out by defendants, the same is cured
by the reception in evidence at the trial, without objection
by the defendants, of the lease and also the reception into
the record, without such objection, of testimony that the
defendants had failed to comply with its covenants and
terms. (See *Cohen* v. *Knox,* 90 Cal. 266, 275, 276, [13
L. R. A. 711, 27 Pac. 215] ; *supra; Slaughter* v. *Goldberg,*
*Bowen & Co.,* 26 Cal. App. 318, [147 Pac. 90] ; *Boyle* v.
*Coast Imp. Co.,* 27 Cal. App. 714, 720, [151 Pac. 25] ;
*Millar* v. *Millar,* 175 Cal. 797, 805, [Ann. Cas. 1918E, 184,
L. R. A. 1918B, 415, 167 Pac. 394].)

[5] 2. The contention that this action was prematurely
brought is without merit. The term of the lease, as ex-
pressly provided therein, was "for the crop season of 1919,"
commencing on the fourth day of January of that year.
The words "crop season" must be construed with reference
to the kind of crops to the growing of which on the lands
the defendants were by the lease restricted, to wit, oats and
rice. These were the crops for the special growing of which
the plaintiff leased the lands to the defendants. The com-
plaint was filed on July 5, 1919, which, as is known as a

matter of common knowledge, was far beyond the time for
the seasonal planting of either rice or oats. The "cropping season" of 1919, so far as the planting of such crops
was concerned, was entirely at an end when the action was
brought, and, the defendants having then already breached
the covenant as to the planting and growing of rice, there
then accrued to plaintiff, at least *prima facie,* a right of
action for the breach.

[6]    3. The evidence, both as to damage and damages, consisted in the main of the opinions of persons who had
had a number of years' experience in rice growing, a
part of which was in the immediate vicinity of the premises
in question. The evidence is practically without conflict
upon the proposition that, in the immediate locality where
the demised lands are situated, the first year's yield of rice
upon land suitable to such production, when the season is
of average propitiousness for such purpose, is or has been
almost invariably greater in bulk or more extensive in
quantity than are the yields of succeeding years. The
explanation of this is in the fact that, from the use of
the great amount of water required to make that cereal grow
and thrive, there usually follows a heavy growth in the
rice-fields of grasses or weeds, indigenous to the soil, the
effect of which is to prevent in a disastrous measure the
proper growth and development of the rice plant. It is
also believed that such condition is partly due to the fact
that intermingled with the rice seed in some instances are
seeds from which develops an exotic plant or weed, inimical
to the growth of rice, and, like all useless things, prolifically
spreads itself over the rice-fields. The opinions of the witnesses were, therefore, based upon the theory that, since
the lands had never been planted to rice prior to the year
1919, and were consequently not handicapped for rice growing by the unfavorable conditions referred to, they would
probably have that year yielded a fair average crop—that
is, such a crop as might confidently be expected from lands
of the same quality and character under the conditions existing with reference to said lands in the year 1919.

It is not necessary to detail herein the testimony of the
witnesses referred to. It will be sufficient merely to give
herein a general summary of their testimony. They testified
that they had been engaged in the growing of rice for five,

four, and three years on lands situated in near proximity
to the lands in question, and which as to the character
of the soil, both as to quality and contour, were in all
respects substantially the same as the lands in question; that
there had been in some years yields of rice on their lands
varying in quantity from thirty-two to sixty or seventy
one hundred pound sacks to the acre. Some had produced
thirty-two such sacks only, others had obtained a yield
of sixty sacks or more, and others had produced forty and
fifty sacks. The larger yields were in years when all con-
ditions for rice productions were fairly good. These same
witnesses testified that they were well acquainted with plain-
tiff's lands, referred to in the lease, and with conditions
generally thereabouts in the year 1919; that said lands were
suitable for rice growing and that, taking into consideration
the climatic conditions in the year 1919, and what lands
similarly situated under like conditions had produced, de-
clared it to be their opinion that thirty-three acres of said
lands, which constituted approximately one-third of those
leased to the defendants, ought to have produced, if prop-
erly cultivated and planted to rice, from forty to fifty
one hundred pound sacks to the acre.

For the purpose of showing the prevailing market prices
of rice in the year 1919 the plaintiff introduced in evi-
dence a printed or typewritten tabulated statement, pre-
pared by the Rice Growers' Association at Sacramento.
This statement, the admission of which in evidence for the
purpose stated was expressly consented to by counsel for
defendants, subject, however, to an objection on the sole
ground that, as applied to any yield of rice per acre which
the court might determine the land would have returned,
it would increase the amount beyond the sum of $1,000,
which, as he contended, was the amount of damages to
the recovery of which the plaintiff was limited by the lease
itself in case of a failure to plant and grow the crops
specified in the instrument, showed the varying market prices
of rice for different qualities during the months of Decem-
ber, 1919, and January, February, March, and April for
some year which is not specifically named in the table
but which we think we may assume was for the year 1920.
The prices as so shown ranged, according to quality and
time, from 6.45c to 7.50c per pound. This table, then, if

not objectionable as evidence upon the single ground upon which defendants objected thereto, stood before the trial court as an element of the general criterion by which said court was to be guided in determining the extent of the damage and the consequent pecuniary loss suffered by plaintiff from the breach of the lease.

The measure of damages in a case of this character "is the amount which will compensate the party aggrieved for all detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, sec. 3300.)

Under all the authorities, the testimony given by the experts as to the probable yield of rice on the lands in question for the year 1919 was undoubtedly competent for that purpose. Indeed, the only and the very best character of evidence for the establishment of the fact of loss of future profits in a case such as the one here must of necessity, as a general rule, come from the testimony of experts or persons who, from long experience in the same line of business, have acquired such a knowledge of the results of the operations of such business as to enable them to state with at least approximate accuracy what, in the way of profits under given conditions, the future potentialities of the business may be. It is, of course, to be conceded that prospective profits, as damages, are incapable of being shown with that accuracy with which the ordinary questions of fact can be established. Expert testimony, especially that from which the court or jury must determine what will be the probable profits of the business in the future, is not always, or even generally, the most satisfactory. [7] But with all these disadvantages with respect to proof in cases of this character, it is still the law that prospective or future profits may be the basis of a recovery. Manifestly, to recover future profits, as damages, it must be shown that the loss in that particular was the direct result of the act or omission of the party from whom recovery of damages therefor is sought. In other words, if the alleged future profits were entirely collateral to the subject matter of the contract alleged to have been broken and not consequences flowing in a direct line from the breach of such contract they will be rejected as not constituting a proper basis for a recovery. But, as is said in *Shoemaker* v. *Acker,* 116 Cal. 239, 245,

[48 Pac. 62]: "Where the prospective profits are the natural and direct consequences of the breach of the contract they may be recovered; and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced of devising a perfect measure of damages." (See, also, Sutherland on Damages, 2d ed., secs. 64, 72, 107, 120; *Masterton* v. *Mayor*, 7 Hill, 61, [42 Am. Dec. 38]; *United States* v. *Behan*, 110 U. S. 344, [28 L. Ed. 168, 4 Sup. Ct. Rep. 81, see, also, Rose's U. S. Notes]; *Rice* v. *Whitmore*, 74 Cal. 619, [5 Am. St. Rep. 479, 16 Pac. 501]; *Hale* v. *Trout*, 35 Cal. 229; *Stoddard* v. *Tread-well*, 26 Cal. 308; *Cederberg* v. *Robison*, 100 Cal. 98, 99, [34 Pac. 625]; *Tahoe Ice Co.* v. *Union Ice Co.*, 109 Cal. 242, [41 Pac. 1020]; *Sacchi* v. *Bayside Lumber Co.*, 13 Cal. App. 72, 85, [108 Pac. 885]; 8 Ruling Case Law, secs. 62, 63, pp. 501, 503.) Of course, the damages claimed in this case are based upon future profits which were the natural and direct consequences of the breach of the contract and not collateral to the subject matter thereof, and the plaintiff was entitled to recover such damages as the court below could justly find from the evidence taken before it, and of which we have given above a statement in substance, that he had suffered through the breach of the contract by the defendants. And we cannot say upon the record before us that the amount awarded is not a just admeasurement of the damages which the plaintiff actually sustained.

4. The claim that the lease itself fixes the damages to which the plaintiff would be entitled in case of the failure of the defendants to execute the terms of the instrument is devoid of force. The provision of the lease upon which the proposition is founded is that which gives to the plaintiff a lien to the extent of $1,000 upon the entire crop which might have been produced on the lands as security for his share of the crop until such share should be delivered to him as provided by the writing. Immediately following that provision in the lease is one whereby the plaintiff was authorized, as further security for his rights under the agreement, and in case he should deem himself "insecure and unsafe in the matter of rental," to take immediate possession of the premises, harvest the crops and sell the same, accounting to the defendants for whatever they might be entitled to. Reading these two provisions together, it is to

our minds manifest that the provision for the $1,000 lien was not intended for the purpose of providing for liquidated damages for default in carrying out the terms of the lease, but was, in effect, intended only to operate as a mortgage to secure plaintiff for his share of whatever crops that might be grown on the lands. In other words, we do not think that, in inserting in the lease the provision for the lien, the fact of the probable failure of the defendants to cultivate and plant the crops as agreed was in the minds of the parties or that the lien provided for should be referable to such an event. Indeed, the language of the provision in question does not square, either in language or effect, with section 1671 of the Civil Code, providing for agreements for liquidated damages for the breaking of contracts. Said section reads: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by *a breach thereof*, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage." There is, as is to be noted, no express reference in the provision of the lease as to the lien to a breach of the instrument. The section of the code might be applicable to a case of this kind because there is, as we have shown, more or less difficulty to be encountered in such a case in fixing actual damages for a breach of the agreement, but when it is the intention to invoke and apply its provisions in a contract to which they may be pertinent, particularly to a contract (as the one here) damages for the breach of which are not altogether incapable of ascertainment, such intention should be disclosed by language which can leave in the mind little doubt thereof, lest the injured party might be foreclosed from showing a much greater amount of damage than the agreement would limit him to.

5. We cannot say from the record as it is presented to us that the amount allowed by the court as the value of the rice did not represent the then market price at East Nicolaus, at which point the defendants were obligated to deliver the plaintiff's one-fourth share of the crop. Under the lease the defendants were to plant, grow, and harvest the rice and deliver plaintiff's part thereof at the place just named at their own expense, and, as also shown, the finding as to the value of the rice for the year 1919 was predicated

upon the tabulated statement of prices above referred to. That statement did not show the particular market or markets where the prices therein given could be obtained; nor did the defendants show or attempt to show that fact, and since they claimed as a deduction from the price allowed the cost of marketing the rice, we think it was, under the circumstances, incumbent upon them to do so. At any rate, as the only evidence made available to the court upon the question of the price or value of the rice was that afforded by the statement referred to, and, as that statement showed that rice was selling in the market at seven cents per pound, we think the court was justified in accepting it as tending to establish the market price of the rice at the point where the defendants were under their agreement required to deliver it. (*Telander* v. *Tujunga Water & Power Co.*, 43 Cal. App. 492, [185 Pac. 504].)

6. The last point to which attention may be given involves the proposition that it was the duty of the plaintiff to show by pleading and proof that he did not, and could not, rent the premises to be used for other purposes for the remainder of the year 1919 after the lease had been breached and it was too late to plant the land to rice. The point is made for the first time on this appeal, it not having been raised in the court below, as it could have been, either by demurrer or on a motion for a new trial, or by both. But we think a reply to the point lies in the fact that the answer expressly admitted the first part and did not deny, which, in pleading, is the equivalent of admitting, the italicized part of the allegation "that the season for planting said crops or any of them has passed, *and it is now too late to successfully put in any crop upon said premises.*" But it is perhaps true that, since it may be assumed that the premises as they then stood were suitable only for agricultural purposes, they were of some value for pasturage purposes, and as to this it is to be said that the plaintiff, when testifying, admitted that he had rented them temporarily for the pasturing of sheep in the month of November, 1919, and after the defendants had surrendered possession of the lands, and that he received for such pasturage the sum of twenty-five dollars. It seems, though, that the sheep were largely "pastured" from a quantity of loose hay which had been cut by the defendants on the premises, the same

having been left there by them as plaintiff's share thereof. But, even if it be answered that it was the duty of the court to reckon the twenty-five dollars as in diminution of the judgment to that extent, yet, as that item is to be considered by this court in determining whether the judgment should be reversed, it may, when compared to the size of the judgment, justly be disregarded on the doctrine of *de minimis non curat lex.*

There are some other objections to certain findings but they do not, in our view, merit special notice.

The judgment is affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 8, 1921.

All the Justices concurred.