[Civ. No. 16636. Second Dist., Div. Two. Feb. 10, 1949.]

RUSSELL O. PRIEBE, Respondent, v. BETTY SINCLAIR, Appellant.

Fleming & Boyce-Smith for Appellant.

Henry C. Rohr for Respondent.

WILSON, J.—This action was brought by plaintiff to recover from defendant a platinum ring set with diamonds, a gold brooch set with diamonds, and the sum of $2,890.28 alleged to have been loaned to her by plaintiff. The court found that he was not entitled to recover the brooch or the money; that the ring was given to defendant as an engagement ring; that defendant broke off the engagement with plaintiff and refused to marry him; that he was at all times ready and willing to marry her until she broke the engagement. Judgment was rendered in favor of plaintiff for the recovery of the platinum ring or its value, $2,500, from which judgment defendant has appealed. Defendant contends that the

evidence is insufficient to sustain the findings and judgment relating to the ring.

Plaintiff and defendant are in accord in their testimony that they met in August, 1945; plaintiff proposed marriage on the night after their first meeting, and thereafter they saw each other almost every day; they became engaged to be married in October, 1945, at which time he gave her a diamond solitaire ring; he then moved his belongings into her home and thereafter spent a considerable portion of his time there; they indulged in sexual relations from the date of their engagement until it was broken; in December, 1945, plaintiff had the diamond from the ring reset in a platinum mounting containing six other diamonds and at about that time she announced their engagement.

During the period of their engagement plaintiff gave defendant the brooch, valued at $400, and expended for her account and in the improvement of her property $2,890.28, the sum sought to be recovered in this action.

Throughout the association of plaintiff and defendant she knew he drank intoxicating liquor; in her testimony she described him as a "heavy drinker"; she said she did not drink. Since this habit continued from the time they first met until their relations ceased, it cannot be advanced as a reason for the severing of their relations.

The engagement was broken on September 10, 1946. The parties disagree as to all that was said and done at that time. They agree as to the fact that on that evening plaintiff, who was about to depart on a three weeks' trip, expressed his intention of attending a prize fight; defendant disapproved of his plan and became angry because he was not to have his dinner with her; in his presence she called an unidentified person on the telephone and made an engagement for dinner. Defendant says the person she called was a woman but she did not so inform plaintiff at that time. What he heard of defendant's part of the telephone conversation led him to believe she was making arrangements on her own initiative to dine with another man. Her action angered him. After a quarrel in which he used some abusive language toward her he departed.

Thereafter plaintiff called at defendant's home four or five times in an endeavor to talk with her. On some occasions she refused to see him on the pretext that "he was drinking." Two friends visited her at his request, he telephoned and he

wrote letters to her all for the purpose of apologizing for his conduct on September 10 and of seeking the continuance of their engagement. She did not apologize to him for her conduct and did not answer his letters.

Near early November, he made a final effort at reconciliation which defendant rejected because, as she testified, he was drinking. Her refusal to talk with him on the several occasions referred to on the specious plea that he had been drinking, came with ill grace since that had been his usual condition since their first meeting.

When it became evident that defendant would not accede to plaintiff's efforts at reconciliation he became engaged to another woman and later married her.

Plaintiff wrote two undated letters to defendant, postmarked respectively October 14 and October 16, 1946. The first letter is headed ''Monday Evening'' and reads in part as follows:

''Betty Dear: Had a long talk with Zelma. After listening to her and thinking over the situation I had to agree she was probably right and correct in her suppositions. Darling I was and am very much in love with you and please believe one thing, I could stand nearly anything but to think you would go out and cheat. Maybe I don't always compliment you on your appearance—you always look nice when we go out and you and I both know it but of course a woman likes to hear that she is attractive. But honestly darling I couldn't believe you would go out and do anything and then when you made the phone call everything seemed to go red in front of me. I've never been jealous before of anyone—why in hell is it that two people that are as fond of each other as we are try to hurt the other. You hurt me cruelly that night. You suspected you would. I hurt you by stopping payment on that check. Darling let's please be sensible. We are meant for each other. No two people could have more in common than we—no two have more enjoyment in being together than we. Can't we both just each be a little more reasonable and considerate of the other one's feelings. It can't be too late. Let's talk this over in a serious, sensible way. I do now realize you care and did care very deeply. I was never really sure of that before—thought always you were fickle—was only playing with me. I am convinced you were very sincere.

''I am leaving for the East Thursday—am enclosing this will and testament written in longhand which is good in

California if anything should happen to me, . . . Regardless dear I am sorry. There must be a sensible solution to our problem and I really think with your help we can work this thing out. Life with you could be wonderful with just a little of understanding on the part of each of us. If we are only considerate of the feelings and thoughts of the other we should never have any serious arguments. They really are unnecessary. Just try and not be sarcastic and we should have a lovely life together. I know you were deeply hurt dear. Really I am sorry. I was, too. All of my plans and thoughts center around you darling. Are we going to be foolish and throw them away or really serious and try to help each other. I do love you dear and really want you."

After plaintiff had had a telephone conversation with defendant he wrote the second letter, which is marked "Tuesday Evening" and is as follows:

"Betty Dear: Confirming our telephone conversation, I am not absolutely sure exactly the wording of my letter to you. However, it came from the heart. I am not trying to sell you an idea nor am I attempting to get back into your good graces by written word. I happen to love you, Darling. Nothing I can say or do will recall things done or said but I do mean that it and those things will never happen again.

"As far as the ring is concerned Betty please believe me it was given to you as an engagement ring—regardless of what I have done to make you think otherwise I really want to marry you, the ring is the symbol of those thoughts— however, it is yours darling and if you will only give me the opportunity to try and work out with you our future— you should be willing to give it another try—Honey, just try & be reasonable and honestly I'll honestly try to see your side of any discussion. The ring was really given to you with one idea in mind—our engagement—it is yours, dear,—will always be yours. Of course when I have been hurt I've said things, as you have, that neither one of us really meant—Let's start from scratch again dear. The ring was not given as a present. The ring was given because I want to marry you and it was our engagement ring. However, if ever and darling never will a repetition occur of that awful nightmare of that Tuesday—it still is your ring—yours darling—and I only humbly say if you do care like I do you will wear it as an engagement ring because all of my hopes, plans and wishes revolve around you.

"Let's talk over our problems . . . this thing can be worked out in a sensible way. . . . We were meant for each other. . . . We can have a wonderful life together. . . . It must be our life together. . . . You are demanding a few things. Darling, I am willing to accede that you are right. Please forgive me my terrible actions—my rotten thoughts. I happen to love you and you know I am too proud to admit that you have been right. Now I say darling I have been wrong. Just give me a chance and you will never regret it. There never will be another quarrel—there never will be another girl—you know it—I'm hooked—not because of anything you've done. It's just you. I want to be the one man in your life darling. Just give me a chance and I'll try and understand your viewpoint and you try and please give me the same consideration.

"Now in conclusion—it isn't a cheap yellow diamond—it happens to be yours darling—therefore it is your ring. I don't want it back it's yours—yours to do with as you want—only I only ask, don't hurt me darling and I will do everything to try and make our life from here on as sweet as you can be when you want to be—Betty dear—Please give me another chance. Is that asking too much darling?"

Parts of the letters which are omitted for the sake of brevity relate to their quarrel, declare that he will make amends if she will permit, and beg for a reconciliation.

The questions presented are these: (1) By reason of section 1590* of the Civil Code did plaintiff become entitled to recover the ring upon the termination of the engagement? The answer to this question is dependent on which party broke the engagement. (2) If defendant is responsible for the break then did plaintiff waive his right to the ring by the language contained in the letters? Stated otherwise, did plaintiff intend to make a gift of the ring regardless of what the subsequent relations of the parties might be, or did he intend that she should retain it only if their engagement continued? The court answered these questions by its findings.

█ The uncontradicted evidence sustains the finding that plaintiff was at all times ready and willing to marry defendant up to the time she broke the engagement. His eagerness for

---

*Section 1590. "Where either party to a contemplated marriage in this State makes a gift of money or property to the other on the basis or assumption that the marriage will take place, in the event that the donee refuses to enter into the marriage as contemplated or that it is given up by mutual consent, the donor may recover such gift or such part of its value as may, under all of the circumstances of the case, be found by a court or jury to be just."

the marriage subsequently to September 10 is attested by his several visits to defendant's home, by his having telephoned to her many times, by his having sent friends to talk to her, all in an effort to bring about a reconciliation.

In arriving at a decision the court was not limited by the language of the letters on which defendant relies. In support of the finding that defendant broke the engagement and refused to marry plaintiff the court had before it the evidence of both parties and that of other witnesses, as well as the letters and the circumstances leading to plaintiff's writing them. Defendant testified she never told plaintiff she would not marry him, yet she rejected all his importunities after the occurrence of September 10. To one of their acquaintances she said, with reference to the possibility of the marriage, ''Well, that remains to be seen.'' To another she said she would not marry plaintiff and never wanted to see him again. The court had a right to consider the evidence of the relations of the parties that had continued for nearly a year in determining whether (1) defendant ever really desired to marry plaintiff or merely consented to such relations for the purpose of financial gain, or (2) plaintiff intended or desired to marry defendant. A further recitation of the evidence is unnecessary. Suffice it to say that it is substantial and is sufficient to sustain the finding.

■ Defendant rests upon the letters as making a gift of the ring even though plaintiff would have been entitled to recover it if they had not been written. The letters were not evidence of a gift of the ring at the time it was presented to defendant since they were written a year afterward. In considering whether they constituted a gift after the engagement terminated the court had a right to take into account the contradictory statements in them, and the state of plaintiff's mind when he wrote them, and to determine the weight to which they were entitled when considered in the light of their contents and in connection with all other evidence in the case. They were written only a short time after the quarrel which separated the parties and at a time when plaintiff, by personal and telephone calls and by visits of his friends to defendant, was trying to heal their wounds and to continue their engagement. He sent her his holographic will with the first letter showing his continuing affection for her.

Defendant relies for confirmation of her claim that the ring was an absolute gift on words in the second letter—''it hap-

pens to be yours darling—therefore it is your ring, I don't want it back it's yours—yours to do with as you want——'' But he added ''only I only ask, don't hurt me darling and I will do everything to try and make our life as sweet as you can be. . . . Please give me another chance.'' In previous portions of the letter he said ''. . . it was given to you as an engagement ring . . . I really want to marry you, the ring is the symbol of those thoughts—however, it is yours darling . . . The ring was really given to you with one idea in mind—our engagement—it is yours, dear,—will always be yours . . . The ring was not given as a present. The ring was given because I want to marry you and it was our engagement ring.'' These contradictory statements, as well as other portions of the letters, are evidence that they are the product of a mind that was distraught, bewildered and confused because of the loss of the woman for whom he expressed his deep affection and to whom he was abjectly apologizing for his conduct, but at the same time calling her attention to her conduct in arousing his jealousy and anger by the manner in which she made a dinner engagement.

The trial court has considered the letters and the other evidence produced, both conflicting and uncontradicted, and as well the inferences to be drawn therefrom, and by its judgment has determined the issues. In view of all the circumstances the court did not err in not accepting the letters as evidence of a gift of the ring after the engagement had been terminated. Since the evidence in support of the findings is substantial, though some is contradicted, we cannot interfere with them.

Defendant maintains that section 1590 of the Civil Code cannot be invoked for the reason that the complaint does not contain an allegation either that the ring was an engagement ring or, in the language of the section, that it was given ''on the basis or assumption that the marriage [would] take place.'' This point is untenable for the reason that the entire trial was conducted on the theory that the question involved was whether the ring was given in token of the engagement of the parties. In consonance with this theory defendant, at the conclusion of the trial, filed an amended answer alleging that the ring was ''presented by plaintiff to defendant as an engagement ring.'' The question now advanced was not raised until the motion for a new trial was argued.

Since (1) evidence was introduced by plaintiff without objection that the ring was an engagement ring, and (2)

defendant made an affirmative allegation that it was an engagement ring, she cannot on appeal maintain the contention that the complaint is insufficient because of the absence of an allegation on the subject. When an action is tried on the theory that a material issue is properly before the court the losing party cannot raise the objection for the first time on appeal from the judgment that there was no such issue (*Grimes* v. *Nicholson,* 71 Cal.App.2d 538, 543 [162 P.2d 934]; *Drullinger* v. *Erskine,* 71 Cal.App.2d 492, 497 [163 P.2d 48]), and the fact that the complaint alleges the issue defectively, or does not allege it at all, is not reversible error. (*Ades* v. *Brush,* 66 Cal.App.2d 436, 444 [152 P.2d 519]; *Asnon* v. *Foley,* 105 Cal.App. 624, 628 [288 P. 792]; *Meer* v. *Cerati,* 53 Cal.App. 497, 505 [200 P. 501]; *City of Redding* v. *Dozier,* 56 Cal.App. 590, 593 [206 P. 465]; *Grimes* v. *Richfield Oil Co.,* 106 Cal.App. 416, 422 [289 P. 245].)

 Although a demurrer would have been sustained by reason of the absence from the complaint of an allegation of fact specifically required by statute in order to state a cause of action, the defect is cured if the complaint is not attacked and the case is tried on the theory that such fact exists. (*Slaughter* v. *Goldberg, Bowen & Co.,* 26 Cal.App. 318, 325-332 [147 P. 90]; *Hirsch* v. *James S. Remick Co.,* 38 Cal.App. 764, 767 [177 P. 876]; *Guidera* v. *Lapiana,* 52 Cal.App. 460, 463 [199 P. 557].)

Judgment affirmed.

Moore, P. J., concurred.

McCOMB, J.—I dissent. In refraining from expressing the reasons for my dissent, I do so because of my belief that there is not any *fundamental principle* involved in this case.

It is my view that Canon 19 of Judicial Ethics of the American Bar Association relative to dissenting opinions is in the public interest and should be carefully adhered to by reviewing courts. Insofar as material here it reads: "Except in case of *conscientious difference of opinion on fundamental principle,* dissenting opinions should be discouraged in courts of last resort." (Italics added. Vol. 62, Reports of American Bar Association (1937), p. 1129, canon 19.)

The theory supporting this canon is well expressed in an article entitled, "Dissenting Opinions," by The Honorable C. A.

Hereschoff Bartlett, which appeared in Law Magazine and Review, vol. CCCXLII, November, 1906, at page 54 et seq.[1]

That the legal profession's views on this subject have not changed during the past half century is well evidenced by certain statements made by The Honorable Frank B. Belcher, past president of The State Bar of California, past president of the Los Angeles Bar Association, and a former member of

---

[1]Mr. Bartlett's article reads in part thus:

"The aim of all judicial systems should be the adjustment and maintenance of principles of law and procedure, and their proper application to the facts of given cases. The judiciary are the arbiters in the settlement of disputed questions of law, and it is through the judiciary that principles of inherent right and justice and equity are vindicated according to the new and fluctuating conditions of government and society; and it is this that has gained for the judiciary in all civilized countries public confidence and respect. Lawyers, it is well known, disagree. This is but natural, however, when one considers the personal motive and keen professional interest excited in behalf of one's client, for the lawyer is but the champion of the cause which he advocates. On the other hand a judge stands indifferent, raised aloof from the influence of party interest, as the arbiter of right and justice. His duty it is, irrespective of personal inclination or prejudice, or the shortcomings of any particular individual, to analyse principles of law in their primitive and fundamental aspect and apply those principles to the facts before him. It is the duty of judges to be so impartial as to be not only willing but ever ready to change an impression that may be erroneous; to be willing to be convinced that they may be wrong. It is the duty of judges to agree and not to disagree; it is their duty to be united and not disunited; it is their duty to be harmonious and not acrimonious; it is their duty to render judgments that the wisdom of the majority should make final and conclusive when the consensus of judicial authority outweighs their individual opinion. Judges should be independent, fearless and unbiased, but they should not be obstinate. Tenacity of purpose and principle is one thing, but tenacity of will that blocks the wheels of justice and brings judicial learning and authority into contempt, is quite a different matter.

"The tendency of dissenting opinions is to bring unrest and doubt not only in the minds of the legal profession but among the public. Certainty of the law is the life of the law, and where principles are so unsettled and disputed as to enable the highest Courts to be almost equally divided, the tendency is to lessen the dignity and authority of judicial decision. Any system is wrong which permits the rendering of dissenting opinions and printing them in public reports of cases—in permitting anything more than the rendering of the judgment of the Court as a Court. What the individual judges think, the arguments they urge among themselves in their private chamber in discussing a case matters little to the legal profession, and certainly less to the public. What the public demands, and what the legal profession asks for is a united judgment either for or against the appellant: what they demand is the full weight and authority of a united Court; and where the minority are over-ruled by the majority, the minority should be suppressed and not permitted to vent their discontent in juridic analysis. The frequently delightful but yet purely academic discussion of the minority is like the wailing of a dog whose tail is caught in a trap—you hear it, *but the dog is caught all the same.* What possible good can result from

the House of Delegates of the American Bar Association, in an address delivered before the Los Angeles Bar Association on November 18, 1948, entitled "What Lawyers Expect of Reviewing Courts."[2]

a dissenting opinion? It certainly cannot control the majority, nor can it in any way affect the law as determined by them. It simply litters up pages of law reports with divergent views, the dissenting judge frequently posing as the champion of a lost cause. The better rule would seem to be to follow the course adopted by some Courts and to make it imperative that the opinion delivered shall be the judgment of the Court. . . . What the legal profession wants are the judgments of its Courts as a united body and not the individual opinions of judges. When a Court decides an important question, its judgment should have the full weight, respect, dignity and authority, which a Court composed of able and distinguished judges is entitled to. As it is, it too frequently happens that judgments of Courts of final resort are but the judgments of one judge, for the Court is so evenly divided that the vote of one judge sways its final determination either to the right or to the left. This difference and confusion of judicial opinion among judges, especially in Courts of final resort, is pernicious in its result; it tends to the decline of judicial authority, and weakens the confidence which the public should be encouraged to have in its highest Courts. . . .

"It is evident, therefore, that what was in the minds of the framers of the Constitution was a Court as a concrete whole rather than a disintegrated number of judges. The judicial power of such a Court, pronouncing its judgment as such, would be unquestioned, whereas the purely academic opinions of a confused and dissenting number of judges leaves the matter in dispute still disputable. . . .

"Nothing is gained by such wide-spread divergence of judicial opinion, for it only tends to bring judicial authority into contempt. . . .

"No one can question the learning, the ability, and the indisputably untarnished character of the judiciary of the United States, but the custom of allowing dissenting opinion is, to say the least, unsatisfactory; it is pernicious in its result and tends to unsettle principles of law. Instead of quieting disputes and permanently defining the straight, broad road of justice, they demonstrate the unstability of the law and how the 'House of the just is divided unto itself.' What humble layman can say he is right or wrong, when we daily behold the ablest jurists on the bench publicly disagreeing among themselves?

"If we wish to avoid the decline of judicial authority we must avoid judicial dissension, judicial divergence of views, judicial discontent, judicial obstinacy; we must have a united Court and a united judgment. Judgments of the highest Courts should be their judgment pure and simple, in which all individuality of the members of the Court disappears and is absorbed in the united opinion of the Court pronounced by the judge who renders it. . . ."

[2]Mr. Belcher said, among other things:

"I come now to a brief discussion of what to my mind is one of the most important features connected with appellate court work, and one which I feel in this state is probably subject to greater criticism than any other. That is the matter of unanimity in decisions. It is something that should always be present whenever it is possible. I express the opinion, purely personal to myself, that the failure to secure unanimity in the decisions handed down by our reviewing courts is very frequently due to the one or the other of three things. Either a lack of industry on the part of members of the court to ascertain exactly what the law

A petition for rehearing was denied March 1, 1949, and appellant's petition for a hearing by the Supreme Court was denied March 31, 1949. Carter, J., voted for a hearing.

is; or, two, insufficient discussion between them in an effort to wipe out what differences may exist; or, three, an unwillingness on the part of some of the members of the court to adhere to the law as it is, coupled with a desire to promote some new concept which has not yet properly found its way into the law.

"I am sure that all of you will agree with me that split decisions undermine the respect and the prestige of courts. It destroys confidence in their opinions, it leaves doubt as to what the law may be, it creates wonder as to whether the dissenting opinion in one case may not be the prevailing opinion in the next. It undoubtedly renders a great deal more difficult the task of lawyers and of trial judges. I feel that the greatest thing which could possibly take place in order to relieve against this flood of dissenting opinions which we have had would be greater discussion by the members of a court. I am tempted to draw upon personal experience in that regard.

"In a great many cases offices receive requests for opinions. In many of those it is of sufficient importance that two or more members of an office may collaborate in preparing or rendering that opinion. If properly approached they should go their separate ways at first in their research and consideration and then come together and agree upon an opinion. I have never had the experience in my own office when after a full discussion, unanimity did not exist. I have yet to see an opinion go out of a law office in which some member of the firm may have dissented.

"This matter of dissenting or split decisions is really quite a serious problem in this state. . . .

"Now, I am not unmindful of the fact that not all men see a legal proposition the same and I realize that on occasions we must expect a diversity of views among the justices of any court. But I do recommend . . . that every effort should be made to avoid the large number of dissents which we are receiving in the opinions from the higher courts in this state.

"Perhaps an all time high or an all time low, as you may choose to regard it, arose in the case of *Green* v. *Burch,* decided by the Supreme Court of Kansas this year, which appears in [164 Kan. 348] 189 Pacific Second, 892, when a Justice Burch, I assume no relation to defendant, wrote the prevailing opinion for the court and then proceeded promptly to dissent. He opens his dissenting remarks with this phrase: 'With regret I realize that I cannot agree with what I have written in behalf of the majority of the members of this court.' " (For the entire address see vol. LXI, No. 281, The Los Angeles Daily Journal, p. 1, November 23, 1948.)